52 N.Y.2d 72 (1980)
In the Matter of Imperial Diner, Inc., et al., Respondents,
v.
State Human Rights Appeal Board, Respondent, and State Division of Human Rights on the Complaint of Eleanor F. Rose, Appellant.
Court of Appeals of the State of New York.
Argued November 14, 1980.
Decided December 22, 1980.
Alan J. Saks and Ann Thacher Anderson for appellant.
David I. Korngut for Imperial Diner, Inc., and another, respondents.
Chief Judge COOKE and Judges GABRIELLI and FUCHSBERG concur with Judge WACHTLER; Judge MEYER dissents in part and votes to reverse and remit in a separate opinion in which Judges JASEN and JONES concur.
*75 WACHTLER, J.
The State Division of Human Rights has found the petitioners, Imperial Diner and its president, discriminated against an employee on the basis of her religion or creed and under the circumstances, compelled her to quit her job. The Appellate Division annulled the determination on the ground that it was not supported by substantial evidence of discrimination. The State Division appeals.
The complainant is a mother of three, who in the fall of 1976 was attending graduate school and working weekends as a waitress at the Imperial Diner. The diner is owned by *76 three individuals one of whom operates it on a daily basis and also serves as its president. On Saturday, October 24, the complainant worked behind the counter, which is considered less desirable than a table station. When she was again assigned to the counter on Sunday, she complained and brought the matter to the attention of the president, who apparently did nothing. However, the head waitress decided to reassign her to a table station.
Later, while the complainant was delivering an order to the kitchen, she saw the president and, thinking he was responsible for the reassignment, thanked him. He responded with an obscene antisemitic remark to the effect that the complainant thought she was something special because she was Jewish, "Just like all the other f---ing Jewish broads around here." When she expressed shock and disbelief her employer told her that she had heard correctly; that all the "f---ing Jewish women" at the diner "think they are something special and deserve more than the others." When she requested an apology he ignored her. At that point she left the diner and went home.
A few hours later she told one of the other owners what had occurred. He said that she should return to work and not be upset because the president was probably just in a bad mood. She agreed to stay on if the president would apologize in front of those who had heard the remarks. Otherwise, she noted, she felt that she might be subject to similar abuse in the future.
Complainant saw the president again, several days later, when she returned to collect her pay. At first he accused her of telling lies about him, but when she protested, he asked her to return to work and forget the whole thing. However, when she requested an apology, he replied, "Never".
After a hearing before the State Human Rights Division, the commissioner found that complainant "was compelled to leave her job because of the ethnic obscenities hurled at her by her employer." The commissioner emphasized the fact that the employer had repeatedly refused to apologize for the remarks. He directed that the petitioners apologize in writing, offer to reinstate complainant with back pay, together with $500 in damages for the "shock, humiliation *77 and outrage" she experienced. The determination was affirmed by the Human Rights Appeal Board, with one dissent concerning the award of back pay.
Petitioners then commenced this proceeding in the Appellate Division seeking to have the determination annulled (see Executive Law, § 298). The commissioner cross-moved for an enforcement order. The Appellate Division held that the determination was not supported by substantial evidence because "the record is devoid of evidence showing a systematic exclusion or restriction, or a generalized pattern of unlawful discrimination, or any evidence of persistent religious or other unlawful discrimination directed at the complainant." Thus the petition was granted and the determination annulled.
By statute, it is an unlawful discriminatory practice for an employer to discriminate against an individual "in compensation or in terms, conditons or privileges of employment" or to discharge an individual on the basis, among others, of race or creed (Executive Law, § 296, subd 1, par [a]). In considering whether the commissioner's determination, that an employer has engaged in an unlawful discriminatory practice, is supported by substantial evidence, we have noted that "three underlying principles should be borne in mind" (300 Gramatan Ave. Assoc. v State Div. of Human Rights, 45 N.Y.2d 176, 183). First, the statute, by its terms, should be "construed liberally for the accomplishment of the purposes thereof" (Executive Law, § 300). Secondly, the commissioner is primarily responsible for administering the law and to that end has been granted broad powers to eliminate discriminatory practices (Batavia Lodge No. 196, Loyal Order of Moose v New York State Div. of Human Rights, 35 N.Y.2d 143, 146-147). Thirdly, one intent on discriminating "cannot be expected to declare or announce his purpose. Far more likely is it that he will pursue his discriminatory practices in ways that are devious, by methods subtle and elusive  for we deal with an area in which `subtleties of conduct * * * play no small part'" (Matter of Holland v Edwards, 307 N.Y. 38, 45).
As far as subtlety is concerned the case now before us *78 is startling because here the employer's contempt for complainant, and his other female employees of her religion or creed was proclaimed crudely and openly, not only to her but to all within her hearing. This type of vilification is humiliating, not only when it is done wholesale, but also, and perhaps especially, when it is directed at a lone individual in an isolated incident. The statute prohibits discrimination, and not just repeated discriminatory acts (see, e.g., Hudson Tr. Lines v State Human Rights Appeal Bd., 47 N.Y.2d 971; Matter of Pace Coll. v Commission on Human Rights of City of N.Y., 38 N.Y.2d 28). Thus, on the basis of the complainant's testimony alone, that her employer reviled her religion or creed in a matter related to her working conditions, the commissioner could find that petitioners engaged in an unlawful discriminatory employment practice which should be redressed. He did not have to also find that this was a regular practice, nor did he have to wait and see if it would become one.
The commissioner could also find that, under the circumstances of this case, complainant was compelled to quit her job as a result of the employer's discriminatory conduct. As in other areas of discrimination it is unrealistic to hold that an employee can only be said to have been the victim of a discriminatory discharge when the employer has expressly fired him on the basis of race or creed or some other discriminatory ground. It is also possible, and perhaps more likely, that an employer who believes certain individuals are undesirable employees because of some discriminatory factor, will engage in conduct which encourages the employee to quit, in which case it may be said that there has been a constructive discriminatory discharge.
Thus, in this case, although the employer did not in so many words fire complainant, and in fact told her she could return to work, the commissioner could attach greater significance to the fact that the employer had never apologized for his remarks and, indeed, adamantly refused to do so even several days after the incident had occurred. He never withdrew the reprimand or stated any change in his attitude that her efforts to improve her working conditions were viewed, by him, as an undesirable trait associated with her *79 religion. He simply let the remarks stand and offered her continued employment, on a take-it-or-leave-it basis, presumably in the same intolerable atmosphere. Thus there was support for the commissioner's finding that when the employer expressed his prejudice against the complainant and repeatedly refused to retract the statement, she was compelled to quit her job to avoid the abuse she had experienced and could well encounter in the future. That is not to say that this was the only conclusion that the commissioner could have drawn from the facts. However, it was a reasonable one and thus may not be set aside by the courts although a contrary decision may "have been reasonable and also sustainable" (Matter of Mize v State Div. of Human Rights, 33 N.Y.2d 53, 56).
Finally, with respect to the remedy we note that the commissioner has broad powers to adopt measures which he reasonably deems necessary to redress the injury including, but not limited to, directing reinstatement with back pay, and awarding compensatory damages (Executive Law, § 297, subd 4, par c; see, also, Holland v Edwards, 307 N.Y. 38, 45-46, supra; Batavia Lodge No. 196, Loyal Order of Moose v New York State Div. of Human Rights, 35 N.Y.2d 143, supra). In this case it cannot be said that the remedy fashioned by the commissioner is not reasonably related to the discriminatory conduct which he found to exist (see Holland v Edwards, 307 N.Y. 38, 46, supra).[*]
Accordingly, the order of the Appellate Division should be reversed, the petition dismissed and the cross motion for enforcement of the commissioner's order should be granted.
MEYER, J. (dissenting in part).
While I concur in the conclusions that a single abusive ethnic remark if sufficiently humiliating can constitute discrimination in "conditions * * * of employment" within the meaning of section *80 296 (subd 1, par [a]) of the Executive Law, and that the record supports the finding that this was such a case, I would not sustain so much of the commissioner's order as required a written apology or as directed the payment of back pay for a period of more than two years.
As to the written apology, in my view the First Amendment protects both the right to speak and the right to remain silent. Just as the First Amendment permits recovery of money damages for libelous speech, it permits the State to protect an employee against the offensive and humiliating speech of his employer. It may not, however, require the employer to apologize any more than it could require that school children recite the pledge of allegiance (Board of Educ. v Barnette, 319 US 624; Ann., 85 ALR3d 402), unless it can be shown that such an enforcement device is essential to the constitutionally permissible purpose of the law. No such showing has been made here.
As to the direction for back pay, I would hold that it constitutes an abuse of discretion insofar as it requires payment during a period when complainant had other employment. Though her employment with petitioner was for weekends only there is no basis for concluding that she would have continued weekend work after she obtained employment during regular workweek hours, and the fact that she has three children suggests the contrary. Moreover, the suggestion in the division's brief that she could not obtain other weekend employment as a waitress because the altercation with the president of the Imperial Diner was "a topic of public notoriety" is based on speculation. Complainant admitted that she had publicized the incident herself, and testified only that one restaurant to which she applied appeared to know of the incident and that she assumed that other local restaurants knew about it as well.
The matter should be remanded for the making of an order within the evidence and within the division's authority.
Order reversed, with costs, petition dismissed and cross motion for enforcement granted.
NOTES
[*] The dissenter's contention that the apology ordered by the commissioner might violate the First Amendment has not been raised by the petitioners and thus is not before us. The petitioners' only argument is that an apology is not authorized or appropriate under the circumstances. However in view of the commissioner's broad powers to fashion relief as well as the significance the employer's refusal to apologize had in this case, it cannot be said that ordering an apology was not essential to eliminate the particular discriminatory practice the commissioner had found.