## CIRCUIT COURT OF THE CITY OF RICHMOND

Jacqueline Griffith

v.

William Otto Smith
and William Clarke

March 4, 1993

Case No. LT-460–2

BY JUDGE ROBERT L. HARRIS, SR.

Before the Court is Defendant William Clarke's Request for Sanctions, pursuant to section 8.01–271.1 of the Virginia Code. Section 8.01–271.1 states, in relevant part:

> Every pleading, written motion, and other paper of a party represented by an attorney shall be signed by at least one attorney of record in his individual name . . . .
>
> The signature of an attorney or party constitutes a certificate by him that (i) he has read the pleading, motion, or other paper, (ii) to the best of his knowledge, information and belief, formed after reasonable inquiry, it is well grounded in fact, and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and (iii) it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation . . . .
>
> If a pleading, motion, or other paper is signed or made in violation of this rule, the court, upon motion or upon its own

initiative, shall impose upon the person who signed the paper or made the motion, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion, or other paper or making of the motion, including a reasonable attorney's fee.

Va. Code Ann. § 8.01–271.1 (1992).

On February 5, 1991, Jacqueline Griffith, through her attorney, Thomas H. Roberts, filed suit in the Circuit Court of the City of Richmond against William Otto Smith and William Clarke, M.D. The suit arose from an auto accident that occurred on October 3, 1989, in which Smith was driving an automobile that collided with a vehicle operated by Griffith. Informed by Smith's insurance carrier that Smith claimed an antibiotic prescribed for him by Dr. Clarke had caused Smith to lose consciousness, Roberts included Clarke as a party defendant based upon an alleged failure to warn Smith of the hazards of operating a vehicle while on the antibiotic.

On March 15, 1991, Defendant Clarke, through his attorney, Michael L. Goodman, filed a Demurrer and asked that sanctions be imposed upon Plaintiff's attorney pursuant to section 8.01–271.1. A hearing was held on April 22, 1991, and finding no cause of action against Clarke had been stated under existing Virginia law, the Court sustained the Demurrer and dismissed the suit against Clarke on May 13, 1991. However, the Court declined to impose sanctions at that juncture, finding that, although the *legal* theory urged by Roberts had not been accepted in Virginia, his argument could be viewed as a "good faith argument for the extension, modification, or reversal of existing law." *Id.* However, the Court did doubt whether a *factual* basis existed for the suit and took under advisement its ultimate ruling on Clarke's Motion for Sanctions to allow Roberts an opportunity to provide some evidence that he had a genuine basis for a reasonable belief that antibiotics were among that class of pharmaceuticals to which a duty to warn of side effects relevant to this suit attached.[1]

---

[1] The fact that the motion for sanctions was filed along with the demurrer and kept under advisement after the sustaining of the demurrer distinguishes this case from *Anderson v. Busman*, 26 Va. Cir. 26 (Va. 1991) (per curiam). In *Anderson*, a motion

The matter of sanctions lay dormant until raised again by Dr. Clarke, through his counsel, by letter to the Court of May 14, 1992.[2] Up through that date, no documentation relating to the factual reasonableness of the allegations in the Motion for Judgment against Clarke had been submitted by Roberts. Following the letter of May 14, 1992, the Court inquired as to the amount of sanctions sought by Clarke, and from that inquiry arose the letter of June 3, 1992 from Clarke's counsel to the Court announcing Clarke's willingness to be satisfied with $500.00 and an apology. That "offer" was subsequently refused by Roberts and a final hearing on the sanctions motion was held on September 10, 1992. Even at that hearing, Roberts offered no documentation supporting the reasonableness of the allegations made against Clarke, but he was given an additional forty-five days to provide, either through another hearing or through affidavits, some evidence either that there was a reasonable factual basis for the claim, or that, prior to filing suit, he had made reasonable inquiry to ascertain whether there was such a factual basis.[3] *See* Va. Code Ann. § 8.01–271.1 (signature of attorney on pleading certifies that "to the

---

for sanctions was submitted *after* the sustaining of a demurrer, with a hearing on the sanctions motion scheduled for a later date. The plaintiffs argued, and the Supreme Court of Virginia agreed, that the trial court lacked jurisdiction to hear the sanctions motion because more than twenty-one days had elapsed since entry of the final order. *See id.* (citing Va. Sup. Ct. R. 1:1). By taking this sanctions motion, filed along with the Demurrer, under advisement, the instant dispute was kept within the breast of this Court.

[2] In his Memorandum in Opposition to Sanctions, filed on November 6, 1992, Roberts accuses this Court of resurrecting this issue "on its own initiative." While there are other misstatements of the record discussed later, this is the most egregious. Roberts knows well that it was Goodman's letter of May 14, 1992, a copy of which was sent to Roberts, following settlement of the dispute between the two remaining parties in this case, which brought back to the Court's attention the one matter still under advisement. The Court's role was limited to requiring that Roberts and Goodman either settle the remaining dispute or set a final hearing for resolution of that dispute.

[3] The reason for giving Plaintiff's counsel this opportunity, as well as the opportunity during the sixteen month period prior to the September 10, 1992, hearing, was that implicit in the Court's judicial observation at the original sanctions hearing on April 22, 1991, that antibiotics are not typically associated with driving risks, is the notion that the factual claim underlying this motion for judgment was so ludicrous that there was no "reasonable inquiry" which could have led to such a conclusion. Since no conceivable inquiry could have led a reasonable person to conclude that physicians are obligated to warn patients of the hazards of driving while taking an anti-

best of his knowledge, information and belief, *formed after reasonable inquiry*, it is well grounded in fact . . . .") (emphasis added). During that forty-five day window of opportunity, Roberts produced affidavits from two fellow attorneys attesting to the reasonableness of his inquiry prior to filing his motion for judgment and affidavits from both a physician and a pharmacist attesting to the possibility of anaphylactic reactions to antibiotic therapy, reactions so severe they can cause loss of consciousness or death. This Court does not believe that the information provided in those affidavits in any way provides a factual basis upon which Roberts could have grounded his Motion for Judgment against Clarke.[4] Accordingly, the Court, for reasons to be discussed, finds that the Plaintiff's Motion for Judgment had no basis in fact and that counsel for the Plaintiff, prior to filing suit against Clarke, engaged in no reasonable inquiry upon which to base any belief that the Motion for Judgment was well grounded in fact. The Court will grant the Motion for Sanctions and order Plaintiff's Counsel to pay $5000.00 of the attorney's fees incurred by Dr. Clarke.

---

biotic, reliance upon such a presumption by an attorney in a motion for judgment is strong evidence that *no* inquiry took place.

In his Memorandum, after erroneously accusing the Court of resurrecting the sanctions question on its own, *see supra* note 2, Roberts complains that the delay in resolving the sanctions question has prejudiced him. Any prejudice was caused solely by Roberts' ostrich-like approach to this matter throughout this period, a period allowed by the Court for Roberts' *benefit.*

[4] Although explained more fully later in this opinion, the factual failing of the anaphylaxis theory when applied to the Motion for Judgment was as follows. As was recognized by Roberts in his affidavit and in the affidavits he submitted from a physician and a pharmacist, anaphylaxis is a life-threatening, allergic response to some substance — in this case, a medication. As was also implicitly acknowledged in the same physician and pharmacist affidavits, the duty of physicians, with respect to the possibility of anaphylaxis (or presumably the possibility of *any* allergic reaction), is to take a careful history from a patient to ascertain whether there exist any allergies that might contraindicate prescription of a certain medication. The duty of the physician, with respect to allergic responses, is not to warn about the risks of driving, as it would be with drugs known commonly to cause drowsiness, but to obtain sufficient history to avoid prescribing a drug to which a patient is known to be allergic. Since the cause of action against Clarke recited in the Motion for Judgment was based upon a theoretical duty to warn about the risks of driving while on an antibiotic, this anaphylaxis rationalization, invoked in hindsight, provides no factual basis upon which the Motion for Judgment could have been grounded.

A request for the imposition of sanctions against an attorney for the wrongful filing of a lawsuit raises delicate issues.

> The possibility of a sanction can protect litigants from the mental anguish and expense of frivolous assertions of unfounded factual and legal claims and against the assertions of valid claims for improper purposes. And, sanctions can be used to protect courts against those who would abuse the judicial process. Yet the threat of a sanction should not be used to stifle counsel in advancing novel legal theories or asserting a client's rights in a doubtful case. Finally, courts should take care that the litigation of a sanction issue does not itself defeat one purpose of Code § 8.01–271.1, that of reducing the volume of unnecessary litigation.

*Oxenham v. Johnson*, 241 Va. 281, 286, 402 S.E.2d 1, 3 (1991). However, this admonition to courts to be cautious in imposing sanctions notwithstanding, an *overabundance* of caution in imposing sanctions against persons who file either frivolous suits or suits born of an improper motive strips the sanctions statute of value. *See Oxenham*, 241 Va. at 298, 402 S.E.2d at 10 (Poff, S.J., dissenting) (goal of sanctions statute of eliminating frivolous litigation "can be achieved only by the imposition of sanctions sufficient to deter such practices"); *cf. Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 253 (2d Cir. 1985), *cert. denied*, 484 U.S. 918 (1987) (court quotes drafters of Federal Rule of Civil Procedure 11 in noting that 1983 amendment to that rule requiring "reasonable inquiry" was "intended to reduce the reluctance of courts to impose sanctions . . . *by emphasizing the responsibilities of the attorney*") (alteration in original). To the extent that attorneys participate in frivolous suits, they diminish the sanctity of a legal system designed to mete out justice and compensation, not serve as a litigation lottery. *Cf. id.* at 297, 402 S.E.2d at 10 (Poff, S.J., dissenting) ("It is an unfortunate fact of life that many defendants, wanting to escape the inherently vexatious nature of litigation, will settle frivolous claims for their 'nuisance value' . . . .").

*Oxenham v. Johnson* is the Virginia Supreme Court's most recent pronouncement on the sanctions provisions of section 8.01–271.1, but federal cases discussing Federal Rule of Civil Procedure 11 are also useful in evaluating the proposed imposition of sanctions against an attorney. In *Oxenham*, both the majority and the dissent, although dis-

agreeing over their interpretation, looked to federal cases for guidance. *Compare Oxenham*, 241 Va. at 286–88, 402 S.E.2d at 4–5 *with id.* at 295, 402 S.E.2d at 9 (Poff, S.J., dissenting). Like the sanctions provisions of other states, section 8.01–271.1 adopts much of the language of Rule 11, making only inconsequential changes. Rule 11 states, in relevant part:

> The signature of an attorney or party constitutes a certificate by the signer that the signer has read the pleading, motion, or other paper; that to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation . . . . If a pleading, motion, or other paper is signed in violation of this rule, the court, upon motion or upon its own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion, or other paper, including a reasonable attorney's fee.

Fed. R. Civ. P. 11; *see also Oxenham*, 241 Va. at 256, n. 4, 402 S.E.2d at 4, n. 4 ("Rule 11 of the Federal Rules of Civil Procedure and Code § 8.01–271.1 are similar in the respects material here."). The concerns expressed by federal courts in approaching sanctions requests are essentially indistinguishable from those voiced by the Virginia Supreme Court in *Oxenham*. *See, e.g., Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393 (1990) ("Although [Rule 11] must be read in light of concerns that it will spawn satellite litigation and chill vigorous advocacy, any interpretation must give effect to the Rule's central goal of deterrence.") (citation omitted).

In *Oxenham*, the trial court had imposed sanctions against the plaintiff's attorney in a malicious prosecution suit. The initial basis for the suit was a notation by a magistrate on an arrest warrant which listed the defendant as the complainant. However, it became quickly apparent, following the filing of the motion for judgment, that the magistrate had erred in his notation and that there would be no evi-

dence, not even from the plaintiff, that could support the claim. Although the case was submitted to a jury, it took only ten minutes for them to reach a verdict in favor of the defendant. Subsequent imposition of sanctions by the trial court was based largely upon the ready availability to the plaintiff's attorney, well before trial, of information demonstrating that the magistrate who issued the arrest warrant had been mistaken in listing the defendant as the complainant. The Virginia Supreme Court reversed the award of sanctions, primarily because the magistrate's notation, albeit in error, provided justification for the initial filing of the suit, *see id.* at 288, 402 S.E.2d at 4, and because section 8.01–271.1 imposed upon plaintiff's counsel "no continuing duty . . . to 'update his pleadings in light of any new findings'." *Id.* at 287, 402 S.E.2d at 4. The court goes on to note, however, that subsequent motions or pleadings essentially serve to reaffirm, at least implicitly, the continued reasonableness of earlier pleadings and that, therefore, a duty to make subsequent "reasonable inquiry" may attach with new motions or pleadings. *See id.* at 288, 402 S.E.2d at 4.

There are significant differences between the instant case and *Oxenham*, differences that have not, however, made this case easy to decide. There is no bright line available for measuring an attorney's conduct in assessing a request for sanctions. As the United States Supreme Court has noted in discussing Rule 11, "The issues involved in determining whether an attorney has violated Rule 11 . . . involve 'fact-intensive, close calls'." *Cooter & Gell*, 496 U.S. at 404 (citation omitted). If there is a behavioral line over which an attorney or a party must cross before imposition of sanctions is appropriate, it is less a line than a broad swath. Many of the more difficult cases will involve attorneys or parties who have entered, but not traversed, this legal no-man's land, with the court left to decide whether the intrusion is sufficiently far to require sanctions. *Oxenham* can be characterized as involving an intrusion into the zone, but only a shallow one, as evidenced by the *Oxenham* court's 4 to 3 split in ruling against the imposition of sanctions. The case at bar involves a deeper and more significant intrusion, one that requires the imposition of sanctions.

The most significant distinction between the instant case and *Oxenham* is that the Court need not be concerned with evaluating the duty, if any, of a plaintiff's attorney to make subsequent reasonable inquiry *after* a motion for judgment is filed, for in this case the alleged failure occurred *before* the suit was filed against Dr. Clarke. In fact, *Oxenham*

is of limited guidance here since the *initial* reasonableness of the suit in that case was not seriously questioned and the case primarily focused on an attorney's obligations *after* filing suit. Although the trial court in *Oxenham* expressed some doubts about the need to allow the case to go to the jury, it did so. *Oxenham*, 241 Va. at 288, 402 S.E.2d at 5. The fact that the case survived to that point makes it difficult to argue that the motion for judgment was sanctionable at its inception. No such difficulty exists in the instant case, although the fact that Clarke's demurrer was granted is only marginally relevant to the issue of sanctions.

> The key question in assessing frivolousness is whether a complaint states an arguable claim — not whether the pleader is correct in his perception of the law. Therefore, courts "do not examine the complaint in the same manner as a court considering a Rule 12(b)(6) motion [to dismiss]," because ultimate failure of the merits is irrelevant.

*Hudson v. Moore Business Forms, Inc.*, 836 F.2d 1156, 1159 (9th Cir. 1987) (quoting *Zaldivar v. City of Los Angeles*, 780 F.2d 823, 832 (9th Cir. 1986)) (citation omitted).

It is undisputed that prior to filing any suit on behalf of the Plaintiff, Roberts was informed by Smith's insurance company that Smith claimed the accident was caused by a medication which made him pass out while driving. Upon further inquiry by Roberts, the insurance company informed him that the prescribed drug had been an unspecified "anti-biotic" [sic]. Upon receipt of that information, Roberts contacted Dr. Clarke's office seeking identification of the specific drug prescribed, but, because the office refused to violate patient confidentiality by summarily divulging that information, Roberts chose to engage in an aggressive discovery technique, a Motion for Judgment naming Dr. Clarke as a defendant.

While the need for further discovery to back up a claim is not evidence of inadequate basis for that claim, a claim which no conceivable further discovery could factually salvage can form the basis for imposition of sanctions.

> For the purposes of Rule 11 the factual inquiry necessary to file a complaint is generally satisfied if all of the information which can be obtained prior to suit supports the allegations made, even though *further* facts must be obtained through

discovery to finally prove the claim. However, a complaint containing allegations unsupported by *any* information obtained prior to filing or allegations based on information which minimal factual inquiry would disprove will subject the author to sanctions.

*In re Kuntsler*, 914 F.2d 505, 516 (4th Cir. 1990), *cert. denied*, 499 U.S. —, 113 L. Ed. 2d 669 (1991); *see also Michaels Bldg. Co. v. Ameritrust Co.*, 848 F.2d 674, 680 (6th Cir. 1988) ("Attorneys who take advantage of . . . liberal pleading provisions . . . by commencing a lawsuit in a desperate attempt to unearth a cause of action through discovery must be checked by the ethics provisions of Fed. R. Civ. P. 11.").

The Motion for Judgment filed against Smith and Clarke in this case alleged that Dr. Clarke had prescribed "certain drugs, including but not limited to an anti-biotic [sic] prescription drug," and had failed to warn his co-defendant, William Smith, of "potential side-affects [sic] . . . including but not limited to the potential danger related to the use and operation of a motor vehicle." Despite the boilerplate "not limited to" language, it is clear that the gravamen of the Plaintiff's argument was that a prescribed drug had made William Smith lose consciousness while driving and that such an event was sufficiently foreseeable to obligate the prescribing physician, Dr. Clarke, to warn of its possibility, a duty that it was then alleged Clarke had breached.

The initial problem with the Plaintiff's complaint is that, again despite the "not limited to" language, the information that counsel for the Plaintiff had at the time the Motion for Judgment was filed, provided at his request by Smith's insurer, was that William Smith had been on one medication, an unspecified antibiotic. There was no indication of other medications, despite the Motion's language; therefore, the reasonableness of the Motion for Judgment's allegations must be judged in light of the known medication, an antibiotic. *See Brubaker v. City of Richmond*, 943 F.2d 1363, 1382 (4th Cir. 1991) ("'[L]ike a snapshot, Rule 11 review focuses upon the instant when the picture is taken — when the signature is placed on the document'.") (quoting *Thomas v. Capital Sec. Serv.*, 836 F.2d 866, 874–75 (6th Cir. 1988)).

Defendant Clarke's request for sanctions was based in part upon the fact that Virginia courts have not recognized "dram shop liability" to third parties. *See Williamson v. The Old Brogue, Inc.*, 232 Va. 350, 352–54, 350 S.E.2d 621, 623 (1986). Because a reasonable argument

could be made that the ruling in *Williamson* did not necessarily control the instant case, *cf. id.* at 353, 350 S.E.2d at 623 ("The basis of the rule is that individuals, drunk or sober, are responsible for their own torts and that, apart from statute, drinking the intoxicant, not furnishing it, is the proximate cause of the injury."), and because, even if *Williamson* was controlling, the sanctions provisions of section 8.01–271.1 are not intended to discourage good faith efforts to extend Virginia law, *see* Va. Code Ann. § 8.01–271.1, this Court, while dismissing the suit, refused to grant Clarke's Motion for Sanctions on the basis of inadequate inquiry as to the legal sufficiency of the claim.

However, at the same time, the Court observed that there appeared to be no factual basis upon which to ground an allegation based upon a duty to warn on the part of Clarke. The Court essentially took judicial notice of the fact that antibiotics are not included in the categories of drugs that might give rise to a duty to warn about an attendant risk of operating a motor vehicle.[5] *Cf. Schuster v. Alternberg*, 144 Wis. 2d 223, 424 N.W.2d 159, 163 (1988) (psychotherapist may be held liable for failure to warn of side effects of *psychiatric medication*); *Gooden v. Tips*, 651 S.W.2d 364, 369 (Tex. Ct. App. 1983) (physician could be liable for failing to warn of side effects of *Quaaludes*); *Kaiser v. Suburban Transp. Sys.*, 65 Wash. 2d 461, 398 P.2d 14, 16 (1965) (physician could be liable to bus passengers injured when a bus driver lost consciousness after taking prescribed *antihistamine* without adequate warning). It is correct, as Roberts has argued, that Plaintiff's counsel was under no obligation to accept as true the representations of Defendant's counsel that antibiotics do not generally cause drowsi-

---

[5] Again, in his Memorandum in Opposition to Sanctions, Roberts asserts that the Court raised this issue *sua sponte*. The record clearly reflects that this point was initially raised in Clarke's Demurrer and again by counsel at the April 22, 1991, hearing on the Demurrer. Roberts goes on to state that the Court took judicial notice that "a person cannot pass out as a result of ingesting an antibiotic." In fact, as noted earlier, what the court observed was that antibiotics, unlike antihistamines, for example, are not generally considered the sort of drug which potentially impairs one's ability to drive. The Court then went on to observe that, since a key element in Roberts' theory of this case required demonstrating that Clarke had a duty to warn Smith of such a hazard, the fact that the prescribed drug was an antibiotic appeared to be factually fatal to that effort and indicative of a lack of reasonable factual inquiry. However, Roberts was given the opportunity over the course of the next year to offer some reasonable basis for believing that such a duty attached to an antibiotic.

ness. *See Oxenham*, 241 Va. at 296–97, 402 S.E.2d at 10 (Poff, S.J., dissenting) (agreeing with majority that counsel not required to accept as truth what opposing counsel told him). However, the ready availability of that information, through even superficial research, prior to the filing of the suit against Dr. Clarke demonstrates clearly both the inadequacy of Roberts' inquiry and the resulting factual void upon which the Motion for Judgment was grounded.

The failure of Roberts to conduct a "reasonable inquiry" to ascertain whether a factual basis existed is more significant than the absence of a factual basis upon which to ground his case against Clarke. *Cf. Brown v. Federation of State Medical Boards*, 830 F.2d 1429, 1435 (7th Cir. 1987) ("[The frivolousness] portion of Rule 11 is composed of two subparts: whether the party or attorney made a reasonable inquiry into the facts, and whether the party or attorney made a reasonable inquiry into the law."). The "reasonableness" of an inquiry is measured not from the "inquiring" attorney's subjective, "good faith" perspective, but from an objective perspective. "The prefiling investigation must appear objectively reasonable. Inexperienced or incompetent attorneys are held to a lesser standard under Rule 11." *Brubaker*, 943 F.2d at 1373. Roberts is an experienced, highly competent attorney and his actions are, therefore, measured by what appears objectively reasonable for experienced, competent attorneys.

While the court in *Brubaker* warned against imposing sanctions simply for "creative claims" that are too creative to avoid dismissal, *see id.*, it also notes that "where there is *no* factual basis for a plaintiff's allegations, the complaint violates Rule 11's factual inquiry requirement." *Id.* In the instant case, there was no factual basis for allegations that Clarke had breached a duty by failing to warn Smith of driving risks attendant to taking a prescribed antibiotic.

Roberts implicitly admits that he undertook *no* inquiry when he argues that he reasonably relied on the "investigation" by Smith's insurance company as factually supporting the claim that an antibiotic made Smith pass out while driving. However, it is clear that the insurance company conducted no investigation of Smith's claim. It simply seized eagerly upon an explanation offered by Smith in order to deny its own liability and then proved an efficient conduit in passing the "explanation" along to Roberts.

Similarly, Roberts also seeks protection behind the coattails of a fellow attorney. In connection with the auto accident that gave rise to

the instant lawsuit, Smith was charged with reckless driving. At a traffic court hearing on January 23, 1990, testimony was offered that at the time of the accident, or immediately afterward, Smith was witnessed "undergoing a seizure." In his affidavit filed in opposition to the imposition of sanctions Roberts reports that, following the traffic court hearing, Smith's attorney at that hearing informed Roberts that he "had been advised that Smith had no prior history of loss of consciousness." The fact that the portion of the hearing transcript submitted by Roberts with his memorandum in opposition to sanctions refers to testimony regarding a seizure *and* the fact that Smith had a previously diagnosed seizure disorder would indicate that Smith's attorney, like his insurer, engaged in no actual investigation.[6] The fact that the traffic court hearing took place *one year* before the Motion for Judgment was filed gave Roberts ample notice that the alleged "freak" nature of the accident would provide an essential element of Smith's defense, as it apparently did in traffic court. The bizarre introduction later in 1990 by Smith, through his insurer, of this specific "an antibiotic made me do it" defense did not end Roberts' obligation to engage in reasonable inquiry before filing suit. While Smith must be held accountable for the interjection of a defense that appeared frivolous on its face, and that, in fact, turned out to be totally fraudulent,[7] Roberts cannot avoid respon-

---

[6] This Court notes that, even if the insurance company or Smith's attorney had conducted an actual investigation, mere reliance by Roberts upon the conclusions of either investigation, in lieu of his own "reasonable inquiry," would have been inappropriate. The court in *Kuntsler* upheld sanctions awarded against an attorney despite his defense of having relied upon other attorneys to assure the reasonableness of the suit. In rejecting that defense, the court states: Mr. Kuntsler's reliance on others was indeed an improper delegation of his responsibility under Rule 11 *to* certify that the pleading filed over his name was well grounded in fact and in law. "The signing attorney cannot leave it to some trustee subordinate, or to one of his partners, to satisfy himself that the filed paper is factually and legally responsible; by signing he represents not merely the fact that it is so, but also the fact that he personally has applied his own judgment." *In re Kuntsler*, 914 F.2d at 514 (quoting *Pavelic & LeFlore v. Marvel Entertainment Group*, 493 U.S. 120, 125 (1989)).

[7] The defense was fraudulent in that Smith knowingly concealed from his attorney at the traffic court hearing, and presumably from the traffic court, his significant history of seizures. According to a report from Dr. Singer, a neurosurgeon, at least one of those seizures had apparently coincided with a prior auto accident. Smith's assertion, with the apparent willing cooperation of his insurer, that an antibiotic made him pass out prior to this most recent accident, factually dubious on its face and merely

sibility for turning Smith's "defense" into an affirmative action against a third party, that "defense turned offense" cannot serve as evidence of its own factual reasonableness. *Cf. Insurance Benefit Adm'rs, Inc. v. Martin*, 871 F.2d 1354, 1356–59 (7th Cir. 1989) (court discusses "reasonable inquiry" requirement in rejecting attorney's defense against sanctions, that he had relied in good faith on his client's claims).

In *Oxenham*, the plaintiff's attorney was found to have reasonably relied on the magistrate's errant notation on an arrest warrant. *See Oxenham*, 241 Va. at 288, 402 S.E.2d at 4. However, reliance on that notation on a document which would be relevant evidence in the ultimate malicious prosecution suit is a far cry from relying on self-serving hearsay passed on by an insurer or uninvestigated representations passed on by an attorney.[8]

Beyond calling Dr. Clarke's office and asking that patient confidentiality be breached without Smith's consent, Roberts conducted no investigation of his own as to the merits of the factual allegations against Clarke.[9] In fact, implicit in his "offer" to Clarke to allow the

---

frivolous when linked to an alleged failure to warn about driving risks arising from antibiotics, becomes fraudulent when asserted by a defendant who knows his own past medical history of seizures.

[8] The Court notes that there was no obligation or reason for either the insurer or Smith's attorney to investigate the legitimacy of the information it received from Smith — in the case of the former, that an antibiotic had made Smith "pass out" and in the case of the latter, that Smith had no previous history of losing consciousness. The attorney's focus was on the "freakish" and "unavoidable" nature of *this* accident — arguments relevant to a defense against a reckless driving charge and to which information regarding past incidents was, at worst, unhelpful, and at best, irrelevant. The insurance company was simply looking out for its own interests in its dubious attempt to shift ultimate financial liability to Dr. Clarke's insurer. Roberts' reliance on these non-investigations is an unacceptable means of satisfying his non-delegable obligation to undertake reasonable inquiry prior to filing a lawsuit.

[9] This Court questions whether this frivolous suit would have been avoided even had Roberts' token factual "investigation," the single call to Dr. Clarke's office, resulted in the identification of the specific type of antibiotic that had been prescribed for Smith. Since Roberts felt justified in filing a suit based upon theoretical driving hazards posed by an unspecified antibiotic, there is little reason to believe that specific identification of the antibiotic would have altered his cavalier approach to factual reality. Indeed, nine months after Clarke's demurrer was sustained, while discovery was well under way, an Amended Motion for Judgment filed by Roberts, while referring to Smith's history of seizures, continued to refer to a driving impairment resulting "from a medication he was taking." Since Roberts, even at that late

latter to delay responding to the Motion for Judgment while Roberts continued his dialogue with Smith's insurer is the notion that no real inquiry was started until after the suit was filed against both defendants. Roberts also implicitly acknowledged this when he admitted at the April 22, 1991, hearing that he was not entitled to Smith's medical records until suit was filed, an admission he made while continuing to argue, ironically, that Clarke was at fault for not breaching patient confidentiality and responding to Roberts' pre-lawsuit request to identify any medications he had prescribed for Smith. As Clarke's counsel, Goodman, pointed out to Roberts prior to the suit being filed against either Smith or Clarke, the essential step in obtaining the relevant medical records was the suit against the person raising the medical defense, Smith. The need to file suit against Clarke was not so pressing that it overcame the statutory requirement for "reasonable inquiry." *Cf. Brown v. Federation of State Medical Boards*, 830 F.2d at 1435 (in assessing reasonableness of inquiry, trial court should consider, among other things, the time available for such inquiry). "Reasonable inquiry," as required by section 8.01–271.1, cannot be interpreted as "no inquiry." *See Szabo Food Serv., Inc. v. Canteen Corp.*, 823 F.2d 1073, 1083 (7th Cir. 1987), *cert. dismissed*, 485 U.S. 901 (1988) ("It is not permissible to file suit and use discovery as the sole means of finding out whether you have a case . . . . Rule 11 requires independent inquiry.") (citations omitted).

Counsel for the Plaintiff was given two opportunities over a one and one-half year period to provide the Court with *any* evidence that a physician prescribing *any* antibiotic is under a duty to warn of potential driving hazards, but submitted nothing until his back was against the wall.[10] Even with his eventual submissions, however, his new post-

___

date, and despite significant revelations regarding Smith's medical history, was apparently still wedded to the theory that a medication contributed to the accident, it seems likely that Dr. Clarke was destined to escape this suit only by a demurrer.

[10] In essence, this Court was willing to excuse the clear absence of *any* factual inquiry if Roberts could provide any evidence upon which he *could have* based a reasonable belief in the factual validity of the claim against Dr. Clarke had he undertaken this *retrospective* inquiry *prior to* filing suit. *Cf. Calloway v. Marvel Entertainment Group*, 854 F.2d. 1452, 1470 (2d Cir. 1988), *rev'd on other grounds sub nom.*, *Pavelic & LeFlore v. Marvel Entertainment Group*, 493 U.S. 120 (1989) ("In considering sanctions regarding a factual claim, the initial focus . . . should be on whether an objectively reasonable evidentiary basis for the claim was demonstrated

hoc rationalization that anaphylaxis could result in loss of consciousness essentially concedes that side-effects affecting driving are not among the common risks associated with antibiotics, risks which would create a duty to warn. Anaphylaxis is a catastrophic form of allergic response that could occur with many, if not all, drugs and to accept counsel's argument is to accept the argument that all physicians are under a duty to warn patients taking *any* medication not to drive for fear of such a catastrophic allergic reaction.[11]

---

in pretrial proceedings or at trial. Where such a basis was shown, no inquiry into the adequacy of the attorney's pre-filing investigation is necessary.").

[11] Both the affidavit of a pharmacist and that of a physician, submitted by Roberts, refer to a duty to warn patients of "side-effects or reactions." This strained effort to equate the warning physicians and pharmacists are obligated to give patients regarding side-effects with a duty to warn about the remote possibility of a catastrophic allergic response is unconvincing. There are, clearly, various side-effects and reactions to antibiotics that may require routine warning, but anaphylaxis is not one of them. *Cf., e.g., Mauldin v. Upjohn Co.*, 697 F.2d 644 (5th Cir. 1983) (suit against drug manufacturer for failing to warn of possibility of ulcerative colitis with antibiotics Lincocin and Cleocin); *Werner v. Upjohn Co.*, 628 F.2d 848 (4th Cir. 1980) (suit against physician and drug manufacturer involving duty to warn of possibility of developing ulcerative colitis with antibiotic Cleocin); *Parke, Davis & Co. v. Mayes*, 124 Ga. App. 224, 183 S.E.2d 410 (1971) (suit against drug manufacturer involving adequacy of warning regarding possibility of developing aplastic anemia with antibiotic Chloromycetin); *Feldman v. Lederle Lab.*, 125 N.J. 117, 592 A.2d 1176 (1991), *cert. denied*, 505 U.S.—, 120 L. Ed. 2d 898 (1992) (suit against drug manufacturer involving failure to warn of potential tooth discoloration from antibiotic Tetracycline); *Kaplow v. Katz*, 120 A.D.2d 569, 502 N.Y.S.2d 216 (1986) (suit against drug manufacturer and physician for alleged failure to provide adequate warnings of possibility of developing hepatitis and peripheral neuropathy from the antibiotic Macrodantin); *McDaniel v. Merck, Sharp & Dohme*, 367 Pa. Super. 600, 533 A.2d 436 (1987) (suit against physician, hospital and drug manufacturer involving link between hemolytic anemia and antibiotic Mefoxin). Roberts has cited this Court to no medical literature linking antibiotics with drowsiness or other side-effects which might make driving hazardous. Additionally, this Court has found no cases, either state or federal, involving drowsiness or loss of consciousness as a relevant "side-effect" of antibiotics. The one near-exception was *Commonwealth v. Zeltins*, — Pa. Commw. —, 614 A.2d 349 (1992). In *Zeltins* a motorist challenged the suspension of her driver's license following her refusal to take a blood-alcohol test. Under state law, in order to justify license revocation, the refusal to take the test must be knowing and conscious. *See id.* at —, 614 A.2d at 353. In accepting the motorist's claim that she was not sufficiently aware of her refusal to be held accountable, the appellate court noted that she had been taking the antibiotic Augmentin and may have mistakenly exceeded the prescribed dose. The court

> When there is a common procedure a doctor must, of course, make such inquiries as are required to determine if for the particular patient the treatment under consideration is contraindicated — *for example to determine if the patient has had adverse reactions to antibiotics, but no warning beyond such inquiries is required as to the remote possibility of death or serious bodily harm.*

*Cobbs v. Grant,* 8 Cal. 3d 229, 104 Cal. Rptr. 505, 515, 502 P.2d 1, 11 (1972) (emphasis added).

In the instant case, the Plaintiff's Motion for Judgment against Dr. Clarke was based solely on a breach of a theoretical duty to warn. While the affidavits finally submitted by counsel for the Plaintiff in opposition to the Motion for Sanctions now refer to a physician's duty to take an adequate history to ascertain allergies, as referred to in *Cobbs,* this was not the theory of his case at any time prior to dismissal of his motion for judgment. Indeed, the first memorandum of law filed by Roberts in opposition to Clarke's demurrer and motion for sanctions refers only to a physician's duty to warn patients of potential side effects of medication. Plaintiff's counsel cannot now avoid imposition of sanctions by seeking, through his post-hoc arguments, to "amend" his original motion for judgment to incorporate a different factual and legal theory. Roberts cannot, in lieu of reasonable inquiry prior to suit, conjure up at a later date unique fact patterns that might create a cause of action. Indeed, given the benefit of hindsight such a last minute effort allows, it is clear that the evidence in this case would never have

---

cited expert testimony that "among Augmentin's documented central nervous system side effects are anxiety, agitation, behavioral changes, confusion, dizziness, and hyperactivity [and] that *there are no restrictions on driving or drinking while taking Augmentin." Id.* at ——, 614 A.2d at 352 (emphasis added). The emphasized language was relevant for if such restrictions were indicated, and appropriate warnings had been given, Zeldins' disregard of those warnings would have left her accountable in the same way that intoxicated persons may not be excused from their actions because of their intoxication. *See id.* at ——, 614 A.2d at 352. The same language also demonstrates the problem with even the most charitable view of Roberts' current argument. Even if the prescribed antibiotic caused an aberrant response, peculiar to Smith, making him lose consciousness, that response would not have been sufficiently foreseeable to have obligated the prescribing physician to outline the attendant risks of driving or operating dangerous equipment. Thus, while such an aberrant response could free Smith from being found negligent, it would not obligate the physician to warn of the possibility of such a response.

supported such a theory. There is no evidence that William Smith was allergic to the prescribed antibiotic and even a cursory investigation by Roberts would have revealed the absence of any basis for an anaphylaxis theory of recovery.

Although the Court has found that Roberts' failure to conduct a "reasonable inquiry" led to the filing of a factually baseless suit and that sanctions are required under the "frivolousness" prong of the sanctions statute, the Court also notes that the second prong of the sanctions statute, improper purpose, might be applicable. *See* Va. Code Ann. § 8.01–271.1. While the focus of the majority in *Oxenham* was on harassment as an improper purpose, because that had been one focus of the trial court in imposing sanctions, *see Oxenham*, 241 Va. at 289, 402 S.E.2d at 5, the language of section 8.01–271.1 makes it clear that "improper purpose" is not necessarily limited to the listed examples of harassment, delay, or increasing litigation costs. *See In re Kuntsler*, 914 F.2d at 518 (factors mentioned are not exclusive).

In the instant case, the complete baselessness of the claim against Clarke might allow the Court to infer an improper motive. "If counsel wilfully files a baseless complaint, a court may properly infer that it was filed either for purposes of harassment, *or some purpose other than to vindicate rights through the judicial process.*" *Id.* at 519 (emphasis added). However, the Court need not rely solely on such an inference. Roberts' "offer" to Clarke, after filing suit, to allow the latter to delay responding pending the insurance company's response, coupled with his oral argument that he wanted to be in a position to hold Clarke accountable if Smith and his insurer were able to avoid liability by demonstrating that the antibiotic had caused Smith to lose consciousness, provide additional indicia that tactical posturing, not vindication of rights, was the motivation here.[12] In that sense, this case

---

[12] Indeed, Roberts' statement, in correspondence with Clarke's counsel, that the only reason he did not sue the pharmacist who filled the Bactrim prescription was that he did not know his identity, further strengthens that inference. Additionally, at the April 22, 1991, hearing on Clarke's Demurrer and Request for Sanctions, Roberts argued, both orally and through his Memorandum, that the controversy was primarily Clarke's fault since the latter had declined to accept his "offer" to allow Clarke to postpone responding to the Motion for Judgment until Roberts learned whether or not Smith and his insurer were going to maintain their "antibiotic" defense.

Unfortunately, such a skewed view, in addition to Roberts' misstatements of the record, *supra* notes 2 and 5, characterized the tenor of this case. Throughout these

is similar to *Cabell v. Petty*, 810 F.2d 463 (4th Cir. 1987). In *Cabell*, after a shotgun was mistakenly returned to a juvenile convicted in Juvenile and Domestic Relations Court of assault with a firearm and then that shotgun was used by the same juvenile to shoot various persons, suit was filed by some of the injured parties against the juvenile, the Commonwealth of Virginia, and the Commonwealth's Attorney of the City of Lynchburg. The Commonwealth's Attorney filed a motion to dismiss based upon substantial defenses, defenses of which the plaintiffs' counsel had apparently been aware at the time of filing suit. At oral argument on that motion the plaintiff took a voluntary nonsuit. *Id.* at 465. Although finding that the case "bordered" on a Rule 11 violation, the district court refused to grant the defendant's motion for sanctions. In reversing that ruling, the court of appeals stated:

> On the available record, we can see absolutely no objective indication that plaintiff's counsel ever intended to seek a modification of the law. Indeed, *counsel's statements at oral argument indicate that the action was filed in a speculative effort to find someone financially liable for plaintiffs' injuries before the statute of limitations expired.*

*Id.* at 466 (emphasis added). While, unlike the plaintiff's counsel in *Cabell*, Roberts did respond to Defendant Clarke's motion to dismiss by credibly arguing the *legal* sufficiency of the claim against Clarke, the glaring absence of a *factual* basis leads this Court to the same conclusion as reached by the *Cabell* court. "If a complaint is not filed to vindicate rights in court, its purpose must be improper." *In re Kuntsler*, 914 F.2d at 518.

Furthermore, also unlike the plaintiff's counsel in *Cabell*, Roberts cannot attempt to justify his tactical posturing by pointing to a statute

---

proceedings, Roberts has attempted to portray himself as a victim, with Clarke, defense counsel, and this Court, as his tormentors. At the final sanctions hearing, on September 10, 1992, Roberts, while presenting no further evidence of the factual reasonableness of the claims in his Motion for Judgment against Clarke, railed against the perceived unfairness of having to defend his legal judgment and strategy from attack by a physician. While this Court has often, in open court, questioned the wisdom of the legislature in providing special treatment to physicians as potential tortfeasors, the Court does not accept the implication that a sanctions request is somehow suspect because it originated with a physician. Roberts' disclaimer that he had nothing against physicians, since he had relatives who were physicians, rang as true as the "Some of my best friends are . . ." disclaimers heard in other contexts.

of limitations problem. He had one year and nine months remaining within the two year limitations period after Smith's traffic court hearing first alerted him to the "loss of consciousness" defense. He had almost one year remaining when he first learned that Smith and his insurer wished to point the finger of culpability at Dr. Clarke. At the time Roberts filed the motion for judgment, he had eight months remaining within the limitations period. *See* Va. Code Ann. § 8.01–243(A) (1992).

The true motivation behind the timing of the suit is illustrated by a letter from Roberts to this Court on April 30, 1991. In discussing the reasons behind his offer to "allow" Clarke to postpone responding to the lawsuit, he refers to ongoing discussions with Smith's insurer.

> I did offer Clarke an opportunity to hold off for a time responding to the pleadings, however as was stated to Mr. Goodman at the time of that offer, this was not because the claim lacked merit, but rather because if Nationwide does not assert the defense involving Dr. Clarke, and since I can only collect once for the damages to my client, *then it would be a whole lot easier to collect them from Nationwide* (emphasis added).

Roberts argues that his effort to hold someone financially accountable arose from a fear of inconsistent verdicts. Evidently his conclusion was that if a jury were to believe that the antibiotic caused Smith to lose consciousness, then Clarke would automatically be liable for failing to warn of that possibility. However, that conclusion presumes a duty to warn which, as discussed earlier, *see supra* note 11 and accompanying text, does not generally attach to antibiotics, a factual failing which reasonable inquiry would have made clear to Roberts. Roberts had known since Smith's January 23, 1990, traffic court hearing that Smith intended to assert the existence of "unavoidable" circumstances which could have potentially absolved him of negligence. Accordingly, when, in October of 1990, Smith's insurer obligingly attempted to shift blame to Clarke, Roberts simply seized upon that opportunity to extend the reach of his litigation net, without concern about, or inquiry into, the factual basis for such an extension.

Roberts fails to recognize that filing a lawsuit is not a benign process akin to making a dinner reservation which one may ultimately, with impunity, choose not to use. A lawsuit generates justifiable con-

cerns in its targets and creates peculiar problems for some professionals. *Cf.* 42 U.S.C.A. § 11131(a) (1992) (requiring insurance companies or other entities paying judgments or settlements arising from medical malpractice claims to report certain information to the United States Secretary of Health and Human Services); Va. Code Ann. § 38.2–2228 (1990) (insurer or health care provider must report all medical malpractice claims to Commissioner of Insurance). It is, therefore, inexcusable, and sanctionable, to cast a wide litigation net, without regard to factual merit, merely in hopes that some money will be caught in that net.

Finally, this Court notes the Virginia Supreme Court's concern in *Oxenham* that sanctions disputes not increase litigation burdens by taking on a life of their own. Although the court in *Oxenham* ultimately found that a claim for punitive damages was frivolous, it refused to remand the case for consideration of appropriate sanctions, explaining "that any effort to segregate the additional expense and anguish occasioned by Oxenham's continued assertion of a frivolous claim for punitive damages would impose additional and unnecessary burdens upon Johnson and the trial court." *Oxenham*, 241 Va. at 290, 402 S.E.2d at 6. The *Oxenham* dissenters treated with thinly veiled skepticism the majority's expressed concern for the burdens which remand might create for the defendant and the trial court. *See id.* at 299, n. 4, 402 S.E.2d at 11, n. 4 (Poff, S.J., dissenting) ("Although the majority's concern for the 'unnecessary burdens upon Johnson and the trial court' is commendable, I believe any additional burdens would be gladly borne by both."). However, the case before this Court demonstrates that there might have been some merit in those concerns for while it was Clarke and his attorney who moved for sanctions, it was also they who initially sought to avoid litigation over the matter by offering a compromise solution, central to which was an apology for the filing of a frivolous suit. Having insisted, through his unreasonable obstinacy, that this matter be fully litigated and resolved by the Court, Roberts has no one to thank for the result except himself.

Having ruled that imposition of sanctions is appropriate, it only remains for this Court to determine an appropriate sanction. Since the primary purpose of a sanctions provisions such as section 8.01–271.1 is deterrence and not fee-shifting, *see In re Kuntsler*, 914 F.2d at 522, any imposition of a monetary sanction must serve that goal even if an underlying consideration is the compensation of victims of frivolous

litigation. *See id.* at 522–23. Although the demeanor exhibited by Thomas Roberts throughout these proceedings suggests that simply having to offer an apology for the frivolous lawsuit would work a hardship on him, First Amendment concerns preclude the Court from *ordering* the apology originally suggested by Clarke and his counsel. *See Imperial Diner, Inc. v. State Human Rights Appeal Bd.*, 52 N.Y.2d 72, 417 N.E.2d 525, 529 (1980) (dissenting opinion criticizes majority for sidestepping discussion of whether an administrative commissioner's order requiring an apology implicated free speech concerns, stating, "[I]n my view the First Amendment protects both the right to speak and the right to remain silent.") (Meyer, J., dissenting); *cf. Desjardins v. Van Buren Community Hosp.*, 969 F.2d 1280, 1282 (1st Cir 1992) (court avoids question of whether a district court's order of a public apology violated the First Amendment by refusing to consider an issue not pursued at the district court level). Counsel for Clarke has submitted an affidavit that states that, to date, $8,023.53 in attorney fees and costs have been incurred by Clarke. Recognizing that some portion of those fees were incurred in arguing that sanctions should be imposed because of the *legal* insufficiency of the claim, a view which this Court rejected following the hearing on Clarke's Demurrer, the Court declines to award the full amount of fees requested. *See id.* at 523 ("Attorney time which is attributed . . . to claims within a pleading which do not merit sanctions should be excluded from consideration."). However, the Court does not believe that, in general, the amount of fees accumulated is unreasonable. More importantly, the Court believes that a substantial award is necessary in order to make it clear to Roberts and to all litigants that post-hoc rationalizations will not substitute for reasonable prefiling inquiry. Accordingly, the Court will enter an order directing that counsel for the Plaintiff, Thomas Roberts, pay $5000.00 to Defendant William Clarke.