[819 NE2d 998, 786 NYS2d 382]

Paula Forrest, Appellant, v Jewish Guild for the Blind et al., Respondents.

Argued September 14, 2004; decided October 26, 2004

**POINTS OF COUNSEL**

*Tuckner, Sipser, Weinstock & Sipser,* New York City (*William J. Sipser* and *Jack Tuckner* of counsel), for appellant. I. The Ap-

pellate Division erred in reversing the lower court and dismissing plaintiff's case when there were contested triable and material issues of fact concerning plaintiff's claims of color and race discrimination. (*Texas Dept. of Community Affairs v Burdine,* 450 US 248; *McDonnell Douglas Corp. v Green,* 411 US 792; *Ferrante v American Lung Assn.,* 90 NY2d 623; *Gregory v Daly,* 243 F3d 687; *Burlington Indus., Inc. v Ellerth,* 524 US 742; *Whidbee v Garzarelli Food Specialties, Inc.,* 223 F3d 62; *Torres v Pisano,* 116 F3d 625; *Richardson v New York State Dept. of Correctional Serv.,* 180 F3d 426; *Holtz v Rockefeller & Co., Inc.,* 258 F3d 62; *Howley v Town of Stratford,* 217 F3d 141.) II. The Appellate Division erred in reversing the lower court and dismissing plaintiff's case when there were contested triable and material issues of fact concerning plaintiff's claims of retaliation. (*Tomka v Seiler Corp.,* 66 F3d 1295; *Pace v Ogden Servs. Corp.,* 257 AD2d 101; *Francis v Chemical Banking Corp.,* 62 F Supp 2d 948, 213 F3d 626; *Ferrante v American Lung Assn.,* 90 NY2d 623; *Wanamaker v Columbian Rope Co.,* 108 F3d 462; *Galabya v New York City Bd. of Educ.,* 202 F3d 636; *Crady v Liberty Natl. Bank & Trust Co. of Ind.,* 993 F2d 132; *De la Cruz v New York City Human Resources Admin. Dept. of Social Servs.,* 82 F3d 16; *McDonnell Douglas Corp. v Green,* 411 US 792; *Richardson v New York State Dept. of Correctional Serv.,* 180 F3d 426.) III. The Appellate Division erred in reversing the lower court and dismissing plaintiff's case when there were contested triable and material issues of fact concerning plaintiff's claims that individual defendants aided and abetted discrimination under New York State and New York City laws. (*Peck v Sony Music Corp.,* 221 AD2d 157; *Patrowich v Chemical Bank,* 63 NY2d 541; *D'Amico v Commodities Exch.,* 235 AD2d 313; *Murphy v ERA United Realty,* 251 AD2d 469.)

*Torys LLP,* New York City (*Lauren Reiter Brody* and *Frances Kulka Browne* of counsel), for respondents. I. The Appellate Division was correct in granting summary judgment on Paula Forrest's race discrimination claims. (*McDonnell Douglas Corp. v Green,* 411 US 792; *Ferrante v American Lung Assn.,* 90 NY2d 623; *Matter of Aurecchione v New York State Div. of Human Rights,* 98 NY2d 21; *Galabya v New York City Bd. of Educ.,* 202 F3d 636; *Pena v Brattleboro Retreat,* 702 F2d 322; *De la Cruz v New York City Human Resources Admin. Dept. of Social Servs.,* 82 F3d 16; *Weit v Flaum,* 258 AD2d 286; *Hatter v New York City Hous. Auth.,* 165 F3d 14, 528 US 936; *Corcoran v GAB Bus. Servs., Inc.,* 723 F Supp 966; *Dister v Continental Group, Inc.,* 859 F2d 1108.) II. The Appellate Division was correct in grant-

ing summary judgment on Paula Forrest's retaliation claims. (*Torge v New York Socy. for Deaf,* 270 AD2d 153; *Taneus v Brookhaven Mem. Hosp. Med. Ctr.,* 99 F Supp 2d 262; *Sitkiewicz v Initial Servs. U.S.A.,* 213 F3d 626; *Parker v Chrysler Corp.,* 929 F Supp 162; *Ioele v Alden Press,* 145 AD2d 29; *Wanamaker v Columbian Rope Co.,* 108 F3d 462; *Galabya v New York City Bd. of Educ.,* 202 F3d 636; *Bennett v Watson Wyatt & Co.,* 136 F Supp 2d 236.) III. The Appellate Division was correct in granting summary judgment on Paula Forrest's aiding and abetting claims. (*Yerry v Pizza Hut of Southeast Kan.,* 186 F Supp 2d 178; *Patrowich v Chemical Bank,* 63 NY2d 541; *Foley v Mobil Chem. Co.,* 170 Misc 2d 1.) IV. Summary judgment may be affirmed on the alternative ground that the complaint is untimely. (*Murphy v American Home Prods. Corp.,* 58 NY2d 293; *Emil v Dewey,* 49 NY2d 968; *Kordich v Povill,* 244 AD2d 112; *Matter of Pan Am. World Airways v New York State Human Rights Appeal Bd.,* 61 NY2d 542; *Acosta v Loews Corp.,* 276 AD2d 214.)

## OPINION OF THE COURT

Chief Judge KAYE.

Racial discrimination has no place in society. Antidiscrimination laws must therefore be strictly enforced to root out this scourge whenever it occurs. But it is simply not the law that every dispute that arises between people of different races constitutes employment discrimination, or that every wrongful act perpetrated in the course of such a dispute is committed because of race. Simply put, animosity on the job is not actionable; unequal treatment based on racial animus is. Because plaintiff has failed to raise a triable issue of fact that she was unlawfully discriminated against on the basis of her race, we affirm the Appellate Division's award of summary judgment to defendants dismissing the complaint.

## I. Facts and Procedural History[1]

Founded in 1914, defendant Jewish Guild for the Blind is a not-for-profit, nonsectarian agency that provides educational, health care and social services to blind, visually impaired and multidisabled persons. Its stated mission is to help those with visual disabilities lead productive, independent, satisfying lives.

Plaintiff is an African-American woman who was hired by the Guild in 1985 as a music therapist in its Continuing Treatment

---

**1.** Except where noted, the facts are undisputed. They are also set out in a comprehensive writing by the Appellate Division (*see Forrest v Jewish Guild for Blind,* 309 AD2d 546, 547-552 [1st Dept 2003]).

Program (CTP). In 1990, plaintiff began an educational leave of absence from the Guild, which lasted for more than a year. By the time she returned, in August 1991, the Guild and the CTP had undergone a substantial reorganization as mandated by the State of New York. In order to continue to receive state funding, the Guild was thus required to implement certain procedures and policies of the State Office of Mental Health. As a result, the CTP was moved from the Guild's Educational Services Department to its Mental Health Services Department (directed by defendant Goldie Dersh), and was renamed the Continuing Day Treatment Program (CDTP).

Upon her return to the Guild, plaintiff was assigned to the CDTP, which was coordinated by defendant Eugenia Adlivankina. In order to reflect the terminology used by the State Office of Mental Health, the job titles of all art therapists, dance therapists and music therapists—including plaintiff— were changed to creative arts therapists.

As an employee of the CTP, plaintiff's responsibilities had been limited to providing music therapy—that is, using music to facilitate the development of goals, such as memory, sequencing or motor coordination. With programmatic restructuring, however, came changes in approach. In the CDTP, all professionals—both creative arts therapists and social workers—were viewed as members of an interdisciplinary team, charged with providing holistic services to program clients. As a result, all professional employees—no longer just social workers—were assigned cases and required to participate in developing treatment plans and maintaining accurate therapy records and documentation so as to comply with Office of Mental Health mandates. With the management of a caseload came such tasks as communicating with clients' family members, scheduling appointments, arranging transportation and attending meetings with other team members. Ultimately, in January 1992, to reflect the shared mission of both creative arts therapists and social workers—all of whom also continued to provide therapeutic services consistent with their own specialized training and qualifications—the job titles for all such professional employees were changed to case manager. Plaintiff's salary and benefits, however, did not change. At around the same time, the desks of all CDTP professionals were relocated into one large office so as to facilitate the shared exchange of client information.

From the start, plaintiff complained about having to share an office and resisted her additional case management responsibili-

ties, preferring to limit her efforts to the conduct of music therapy sessions. Conflict quickly arose. As early as November 1991, plaintiff wrote a memorandum to her union delegate complaining about her case management duties, while stating that she "was not adamantly refusing to cooperate." Moreover, because social workers had always carried caseloads and performed attendant administrative tasks, plaintiff—who neither was trained for nor provided social work services—took the position that she had been forced to undertake the "dual" job of creative arts therapist and social worker, and therefore filed a grievance with her union in which she sought increased pay. In February 1992, plaintiff complained in a memorandum to Adlivankina that her current responsibilities did not allow enough time for her to complete her recordkeeping duties, suggested that she be "free[d] up" to focus on paperwork, and warned, "I see this as being a potential problem we'll have to work out."

In July 1992, after the State promulgated new policies and procedures mandating the use of standardized medical record forms, all staff members, including plaintiff, were provided special training in the completion of the new forms. Plaintiff, however, appears to have had difficulty in complying with her responsibility to maintain these state-mandated patient records. Explaining that the forms were constantly changing, plaintiff fell behind in keeping her patient notes current. Throughout the fall of 1992, plaintiff received oral and written warnings from her supervisors, Dersh and Adlivankina, setting forth instances in which plaintiff had allegedly failed to write progress notes when required, not completed her notes in a timely manner, misdated notes, and written them in an incorrect sequence. Patients who had been absent from therapy sessions were sometimes marked present on medical charts, which plaintiff's supervisors had explained to her were legal documents. The supervisors further advised plaintiff that her notes were frequently unstructured and unrelated to client treatment plans and services provided. In some instances, notes were smudged or illegible.

By November 1992, plaintiff's supervisors were expressing concern that the inaccuracies and omissions in her notes—including with respect to client attendance—threatened to place the Guild out of compliance with state-mandated recordkeeping guidelines for the provision of health services, and with documentation requirements for Medicaid reimbursement. Tell-

ing plaintiff they were worried that the Guild's licensing status and funding might be jeopardized at an upcoming audit by the State Office of Mental Health, plaintiff's supervisors relieved her of the bulk of her other responsibilities so that she could devote the majority of her time to her client charts. She was warned in writing about "what appears to be a lack of responsiveness on your part to previous guidance and instruction in these matters and what seems to be either an unwillingness or inability to properly perform charting tasks." Plaintiff filed grievances with her union concerning the warnings about her recordkeeping, alleging that she was being "harass[ed]."

In December 1992, plaintiff received a written warning for leaving her blind patients unattended. As undisputed by plaintiff, a holiday lunch was being offered to CDTP clients during plaintiff's scheduled lunch hour. Plaintiff nevertheless chose to help serve lunch to the patients. After leaving to take her own lunch 20 minutes into the hour, plaintiff did not return for an hour and 15 minutes—20 minutes after her therapy session was scheduled to begin. Plaintiff then dismissed her group 15 minutes later, in violation of state standards requiring that no group session may be shorter than 45 minutes.

The record reflects other conflicts as well. In June 1992, plaintiff took extended vacation to be with her ailing mother. Because she had failed to provide specific information on when she would return, the Guild eventually reached out to her in Florida in an effort to arrange for patient coverage. Plaintiff thereafter sent a telegram to the Guild, updating her supervisors on her mother's condition. On her return to work, she filed two grievances alleging "harassment" and seeking reimbursement for the cost of the telegram. In October 1992, plaintiff was disciplined for violating the policy that confidential patient records are never to be removed from the CDTP without supervisory permission, and for then refusing to discuss the issue with Adlivankina the morning after the incident on the ground that working hours had not yet begun.

Plaintiff filed complaints with the union and with defendant Carol Handfus, Director of Personnel at the Guild, because she did not like her assigned lunch hour, because a circle had been placed next to her name on a posted time sheet when she was (mistakenly, it turned out) thought to be late, and because Dersh had removed a pad from plaintiff's hand at a meeting. Other complaints were not formally filed because, according to plaintiff, the union "[f]ail[ed] to represent and pursue all of my

claims" and stated, "You are so self-centered and self-involved, all you ever think about are your grievances." Plaintiff eventually filed a complaint against her union with the New York State Division of Human Rights. In January 1993, plaintiff requested transfer to the Guild's Day Treatment Program (DTP), which was coordinated by her friend, defendant Patricia Finocchiaro, and which provides ongoing treatment for visually impaired adults with psychiatric diagnoses, and deaf and blind persons who are cognitively impaired. The DTP is separate from the CDTP and is operated under the auspices of the State Office of Mental Retardation and Developmental Disabilities.

Plaintiff's problems with recordkeeping continued. In March 1994, Finocchiaro wrote a memorandum to plaintiff reflecting Finocchiaro's discovery that, for more than five months, plaintiff had failed to make any progress notes in the records of several clients, though monthly patient progress notes were required. At the end of July 1994, plaintiff requested a three-month leave of absence to begin in August, pursuant to the Family and Medical Leave Act of 1993 (29 USC § 2601 *et seq.*) (FMLA), to care for her seriously ill father in Florida (*see* 29 USC § 2612 [a] [1] [C]). The Guild approved the request, subject to the submission by plaintiff of specified documentation of her father's serious health condition (*see* 29 USC § 2613). Plaintiff was given the requisite form to complete and undertook to return it, with the necessary certification by her father's physician, by August 22.

Between August and October 1994, the Guild sent several letters to plaintiff at the Florida address, by certified mail and Federal Express, requesting the required documentation and providing additional copies of the necessary form. The first certified letter was returned by the post office as unclaimed. The next informed plaintiff that, if she did not submit the mandated certification, she would be considered on unauthorized leave of absence and subject to termination. On October 6, 1994, plaintiff called the Guild and promised to provide the documentation by the following week.

In the meantime, plaintiff had applied for and received unemployment insurance benefits from the New York State Department of Labor on the ground that she was "available and seeking employment in the State of Florida." On October 18, the Guild received a copy of a form requested by the Department of Labor's Unemployment Insurance Division on September 6, and completed by a physician on October 7, diagnosing plaintiff's father with "[h]ypertension, aging and prostate,"

recommending medication as treatment, and—in response to the question, "What home care, if any, is needed?"—stating, "Needs family member."

Because the certification contemplated by the FMLA requires more specific information than was contained on the unemployment insurance form,[2] the Guild sent two more letters by express mail, informing plaintiff of the inadequacy of her submission and setting a new compliance deadline of October 31. Three days before the deadline, the Guild was notified by Federal Express that its last letter had been refused and that the courier had been advised by plaintiff's father that plaintiff was not at that address. Handfus then called plaintiff's father, who informed her that plaintiff had left his home three weeks earlier and gone to Hawaii, and that he had been living without any help at home since that time. Finally, on November 2, 1994, Handfus sent a letter to plaintiff detailing the events surrounding her leave, and advising her that her employment had been terminated on the ground of job abandonment.

Two days later, a resignation letter dated October 22, 1994, and "effective immediately," arrived from plaintiff:

> "I want to express my gratitude for the opportunity to serve, utilize my talents, and grow both professionally and personally. It was most rewarding for me to see the value of my contributions in helping others.

> "Extenuating circumstances, the most paramount one being the care of my father, has brought me to this juncture in my life. That care is now required beyond the limitations of my leave of absence which the Guild has already granted."

By November, plaintiff had begun a new job as a school teacher in Florida.

---

2. 29 USC § 2613 (b) provides that certification by a health care provider of the serious medical condition of an eligible employee's family member shall be sufficient if it states the date on which the serious health condition commenced; the probable duration of the condition; the appropriate medical facts within the knowledge of the health care provider regarding the condition; and a statement that the eligible employee is needed to care for the family member and an estimate of the amount of time that such employee is so needed. The Guild's form, which plaintiff agreed to submit, additionally requested her father's regimen of treatment and schedule of medical visits or treatment; information from the physician concerning assistance her father might need for basic medical, hygiene or nutritional needs, safety, or transportation; and a statement from plaintiff as to the care she would be providing.

Meanwhile, in September 1994, after having started her FMLA leave, plaintiff filed a complaint with the New York City Commission on Human Rights and the Equal Employment Opportunity Commission (EEOC), alleging that defendants had discriminated against her on the basis of race and color and in retaliation. In her complaint, plaintiff alleged that in October 1992, she was told that Dersh had referred to her as an "uppity nigger." In June 1997, plaintiff filed an amended complaint with the City Commission, alleging additional acts—including that Adlivankina had encouraged plaintiff's coworkers to refer to her as "our Black American Princess"—that were purported to have occurred prior to the filing of the original complaint but omitted from that pleading.

Dissatisfied with the investigation conducted by Commission attorneys, plaintiff wrote letters regarding a supervisor's "unwarranted attitude," and accusing the Commission of racial discrimination and failure to render "unbiased assistance to all people": "[M]y complaint against the employer with whom I encountered conflict has already been recorded. It is not an encouraging experience to have it occur within the Commission as well." Because plaintiff failed, despite the Commission's request, to rescind the right-to-sue letter she had received from the EEOC, as required in order for the Commission to continue its investigation, the Commission administratively closed her case. Within weeks, plaintiff filed suit against defendants in the United States District Court for the Southern District of New York, alleging violations of federal, state and city antidiscrimination laws. Three months later, she voluntarily dismissed that action.

In February 1998, more than three years after her employment with the Guild had ended, plaintiff commenced the instant lawsuit seeking several million dollars in damages, alleging that defendants discriminated against her on the basis of race and color and retaliated against her for complaining about such discrimination, in violation of the New York State Human Rights Law (see Executive Law § 296 [1] [a]; [7]) and the New York City Administrative Code (see Administrative Code of City of NY § 8-107 [1] [a]; [7]). In her complaint, plaintiff pleaded an additional racial slur made by Dersh, not previously alleged, said to have been uttered in 1992: "Why do we always have to stroke Blacks to get them to work?"

After plaintiff and three of the individual defendants were deposed, defendants moved for summary judgment dismissing

the complaint. Supreme Court denied defendants' motion, and the Appellate Division reversed. We now affirm.

## II. Racial Discrimination

### A. Discriminatory Employment Action

A plaintiff alleging racial discrimination in employment has the initial burden to establish a prima facie case of discrimination.[3] To meet this burden, plaintiff must show that (1) she is a member of a protected class; (2) she was qualified to hold the position; (3) she was terminated from employment or suffered another adverse employment action; and (4) the discharge or other adverse action occurred under circumstances giving rise to an inference of discrimination (*see Ferrante v American Lung Assn.*, 90 NY2d 623, 629 [1997]). The burden then shifts to the employer "to rebut the presumption of discrimination by clearly setting forth, through the introduction of admissible evidence, legitimate, independent, and nondiscriminatory reasons to support its employment decision" (*id.* [citations omitted]). In order to nevertheless succeed on her claim, the plaintiff must prove that the legitimate reasons proffered by the defendant were merely a pretext for discrimination by demonstrating both that the stated reasons were false and that discrimination was the real reason (*see id.* at 629-630).

To prevail on their summary judgment motion, defendants must demonstrate either plaintiff's failure to establish every element of intentional discrimination, or, having offered legitimate, nondiscriminatory reasons for their challenged actions, the absence of a material issue of fact as to whether their explanations were pretextual. In that event, summary judgment would constitute "a highly useful device for expediting the just disposition of a legal dispute for all parties and conserving already overburdened judicial resources" (*Matter of Suffolk*

---

**3.** The standards for recovery under the New York State Human Rights Law (*see* Executive Law § 296) are the same as the federal standards under title VII of the Civil Rights Act of 1964 (42 USC § 2000e *et seq.*; *see Rainer N. Mittl, Ophthalmologist, P.C. v New York State Div. of Human Rights*, 100 NY2d 326, 330 [2003]). Thus, "[b]ecause both the Human Rights Law and title VII address the same type of discrimination, afford victims similar forms of redress, are textually similar and ultimately employ the same standards of recovery, federal case law in this area also proves helpful to the resolution of this appeal" (*Matter of Aurecchione v New York State Div. of Human Rights*, 98 NY2d 21, 26 [2002] [citation omitted]). Further, the human rights provisions of the New York City Administrative Code mirror the provisions of the Executive Law and should therefore be analyzed according to the same standards.

*County Dept. of Social Servs. [Michael V.] v James M.*, 83 NY2d 178, 182 [1994]), inasmuch as no valid purpose is served by submitting to a jury a cause of action that cannot survive as a matter of law. Defendants have satisfied their burden.

The first two elements necessary to establish a claim of discrimination are not in dispute. Plaintiff is an African-American woman, qualified for the job she held at the Guild. She has, however, failed to raise a triable of issue of material fact as to whether any adverse employment action she alleges she suffered occurred under circumstances giving rise to an inference of discriminatory motive. Preliminarily, plaintiff's proof of adverse action is in large measure wanting. She asserts three such actions: her "demotion" from music therapist to creative arts therapist and then to case manager; a series of interpersonal conflicts with her supervisors; and her ultimate termination.

An adverse employment action requires a materially adverse change in the terms and conditions of employment. To be materially adverse, a change in working conditions must be "more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation" (*Galabya v New York City Bd. of Educ.*, 202 F3d 636, 640 [2d Cir 2000] [citations and internal quotation marks omitted]).

Plaintiff has offered no evidence that her change in job title constituted a demotion. Rather, the undisputed proof is that the title of creative arts therapist was adopted as part of the Guild's 1991 restructuring in an effort to be consistent with the terminology used by its state regulatory agency, and was applied to all similarly situated employees. Later, all professionals in the CDTP were restyled case managers to reflect the holistic approach valued by the program. Plaintiff's salary and benefits were unaffected by these changes.[4]

---

4. The concurrence's statement that plaintiff alleges a reduction in pay as a result of discrimination is misleading (*see* concurring op at 318, 328). Plaintiff's salary did not change when her job title changed from music therapist to creative arts therapist to case manager. When she later requested a voluntary transfer to a different department, which she does not claim was discriminatory, she accepted a different job at a lower pay grade.

Nor does the alleged mistreatment suffered at the hands of her supervisors rise to the level of adverse action as defined by law. The snatching of a pad from her hands, the patting of a seat in an allegedly humiliating way, the shouting at her in a meeting, the circling of her name on a time sheet, the rolling of eyes when she spoke—none of these constitutes a materially adverse change in the terms and conditions of plaintiff's employment (*see e.g. Fridia v Henderson*, 2000 WL 1772779, *7, 2000 US Dist LEXIS 17295, *22 [SD NY, Nov. 30, 2000] [excessive work, denials of requests for leave with pay and a supervisor's general negative treatment of the plaintiff are not materially adverse changes in the terms, conditions or privileges of employment]; *Katz v Beth Israel Med. Ctr.*, 2001 WL 11064, *14, 2001 US Dist LEXIS 29, *44 [SD NY, Jan. 4, 2001] ["Being yelled at, receiving unfair criticism, receiving unfavorable schedules or work assignments . . . do not rise to the level of adverse employment actions"]).

Plaintiff has, however, raised a triable issue of fact as to whether she was terminated from her employment. Clearly, termination constitutes an adverse action. Plaintiff concedes that she intended to resign from the Guild on October 22, 1994, effective immediately. But she asserts that she was nevertheless terminated because the Guild sent her a letter of discharge prior to its receipt of her resignation. Whether in these circumstances the Guild's action preempted and rendered ineffective her resignation presents a question of fact that a jury might resolve in her favor. But plaintiff still cannot avoid summary judgment for defendants because, even assuming that she has made a prima facie showing as to the fourth element, she has failed to rebut defendants' proof that the purported termination did not arise under circumstances giving rise to an inference of discrimination—that is, that she was not terminated "because of [her] race" (Executive Law § 296 [1] [a]; Administrative Code of City of NY § 8-107 [1] [a]).

Rather, the undisputed facts establish that plaintiff repeatedly failed to comply with her obligation to submit documentation in support of her family medical leave substantiating the nature of her father's serious illness. Plaintiff's lack of cooperation and failure to adhere to her commitments by themselves establish legitimate, nondiscriminatory reasons for ending her employment. And plaintiff's actions in traveling to Hawaii and leaving her father, without notifying the Guild of this substantial change, placed her in violation of statutory standards for entitle-

ment to family medical leave and provided further justification for the Guild's decision.[5]

In response to this showing by defendants that their actions were justified by plaintiff's conduct, plaintiff has offered no evidence that defendants' legitimate explanations were a pretext for unlawful discrimination—that is, that they were false and that racially motivated discrimination was the real reason.[6] Indeed, plaintiff fails to demonstrate any causal relationship between the racial epithets allegedly uttered in 1992 by Dersh and Adlivankina, and her purported termination from Finocchiaro's department in 1994, that could conceivably demonstrate that the termination occurred under circumstances giving rise to an inference of discrimination (see Price Waterhouse v Hopkins, 490 US 228, 277 [1989] [O'Connor, J., concurring in judgment] ["statements by nondecisionmakers, or statements by decision-makers unrelated to the decisional process itself," are insufficient to establish discriminatory intent]).

■ Simply put, plaintiff has failed to raise an issue of fact as to whether she was discriminated against on the basis of her race. To be sure, the record establishes that there was no love lost between plaintiff and her supervisors. Indeed, as a cycle unfolded of supervisory dissatisfaction with plaintiff's work; the giving of warnings; complaints about the warnings; a perceived lack of improvement; and more warnings followed by more complaints, any number of fair inferences could be drawn from the record as to the motives underlying such events.

Racial animus, however, is not among them. Plaintiff herself was hard pressed at her deposition to articulate any basis for her claim that defendants' alleged unfair treatment and harassment was race-based, other than a repeated assertion—or as-

---

5. Of course, it matters not whether the Guild's stated reason for terminating plaintiff was a good reason, a bad reason, or a petty one. What matters is that the Guild's stated reason for terminating plaintiff was nondiscriminatory.

6. Plaintiff's mere assertion that defendants' explanations were pretextual is not enough. As the concurrence notes (see concurring op at 325), "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated" (Reeves v Sanderson Plumbing Prods., Inc., 530 US 133, 148 [2000]). But plaintiff's prima facie case, combined with no evidence that the stated justification is false other than plaintiff's unsupported assertion that this is so, may not.

sumption—that she was the only one so treated:[7] only she was told that she was jeopardizing the department (but only she had such difficulties with her charts); only she and another African-American employee had the spaces next to their names circled on a time sheet (but only they had not yet signed in and so were thought to be late); only she had to sign out for breaks (but when cross-examined, she admitted that others actually signed out as well); only she was refused overtime compensation (but although her overtime request arose from having stayed late to complete her reports, plaintiff did not dispute defendants' evidence that overtime is simply not available to employees of the Guild and that compensatory time is available only for direct patient care, not paperwork).

Indeed, prior to having taken her final leave from the Guild, plaintiff did not complain of racial discrimination in any forum. Although her grievances made clear that she felt "harass[ed]," she never alleged that the harassment was racially motivated. Rather, her union grievances for harassment alleged violations of articles IV, VII and XVII of the Collective Bargaining Agreement—pertaining to management rights over employees' job responsibilities, procedures for disciplining employees and vacation rights—not article V, which specifically prohibits discrimination, including racial discrimination. Nor did her resignation letter—thanking the Guild for "the opportunity to serve, utilize my talents, and grow both professionally and personally"—give any hint that she had ever been, or believed she had been, subjected to discrimination based on her race.

To be sure, discrimination, when it occurs, is a serious evil to be dealt with seriously. But mere personality conflicts must not be mistaken for unlawful discrimination, lest the antidiscrimination laws "become a general civility code" (*Faragher v City of Boca Raton*, 524 US 775, 788 [1998] [citation and internal quotation marks omitted]; *see also Gorley v Metro-North Commuter R.R.*, 2000 WL 1876909, *7, 2000 US Dist LEXIS 18427, *25-26 [SD NY, Dec. 22, 2000] ["Even if (plaintiff's supervisor) did harbor personal animosity against plaintiff . . . Title VII

---

7. In other instances—the shift in job titles, the assumption of management responsibilities, the consolidation of professional employees' offices—plaintiff continues to insist without explanation that these actions, when applied to her, were racially discriminatory, even while admitting that others were subjected to identical changes and policies. Such conclusory assertions cannot rebut the evidence proffered by defendants that the actions taken were nondiscriminatory.

provides relief only for racial discrimination, not fickleness"],
*affd* 29 Fed Appx 764 [2d Cir 2002]; *Gibson v Brown*, 1999 WL
1129052, *12, 1999 US Dist LEXIS 18555, *34 [ED NY, Oct. 19,
1999] ["Personal animosity is not the equivalent of . . .
discrimination and is not proscribed by Title VII. The plaintiff
cannot turn a personal feud into a . . . discrimination case by
accusation" (citations omitted)], *affd* 242 F3d 365 [table; text at
2000 WL 1843914, 2000 US App LEXIS 33119 (2d Cir 2000)];
*Padob v Entex Info. Serv.*, 960 F Supp 806, 813 [SD NY 1997]
["It might be just as likely that Plaintiff was excluded because
of her acknowledged personality conflict with (her supervisor)—
but such behavior is not prohibited by (antidiscrimination
laws)"]).[8]

B. Hostile Work Environment[9]

██ Even one racial epithet is inexcusable. Employers are
therefore both free and well advised to adopt zero tolerance
policies in the workplace. But in the absence of a single affidavit
from anyone who heard the alleged epithets, or of any written
report filed by plaintiff or anyone else, at any time, alleging the
remarks, plaintiff's assertion that defendants used three racial
slurs—in one instance asserted for the first time nearly six
years after the comment was purportedly made—as a matter of
law cannot establish a hostile work environment.

A racially hostile work environment exists "[w]hen the
workplace is permeated with discriminatory intimidation,
ridicule, and insult that is sufficiently severe or pervasive to
alter the conditions of the victim's employment and create an
abusive working environment" (*Harris v Forklift Sys., Inc.*, 510
US 17, 21 [1993] [citations and internal quotation marks omit-
ted]). While deplorable, the use of three epithets over a nine-
year employment history does not satisfy this test.

Whether an environment is hostile or abusive can be deter-
mined only by looking at all the circumstances, including "the
frequency of the discriminatory conduct; its severity; whether it
is physically threatening or humiliating, or a mere offensive ut-

---

8. While we agree with the conclusion reached by the Appellate Division,
that Court should not have preliminarily left aside the asserted racial epithets
in analyzing whether the remainder of the complained-of conduct occurred
under circumstances giving rise to an inference of discrimination. All of the
relevant facts and circumstances must be considered together.

9. Plaintiff's claim that she has suffered disparate treatment in the
workplace may be shown through proof either of discriminatory employment
action or that she has been subjected to a hostile work environment.

terance; and whether it unreasonably interferes with an employee's work performance. The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive" (*id.* at 23). Moreover, the conduct must both have altered the conditions of the victim's employment by being subjectively perceived as abusive by the plaintiff, and have created an objectively hostile or abusive environment—one that a reasonable person would find to be so (*see id.* at 21).

Of course, even a "mere[ly] offensive" (*id.* at 23) racial slur is reprehensible. But it is not actionable. Here, the epithets complained of did not pervade plaintiff's work environment, having allegedly occurred on three occasions over nine years. A hostile work environment requires "more than a few isolated incidents of racial enmity" (*Snell v Suffolk County*, 782 F2d 1094, 1103 [2d Cir 1986]). "[I]nstead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments" (*Schwapp v Town of Avon*, 118 F3d 106, 110 [2d Cir 1997] [citation omitted]; *see also Harris*, 510 US at 21 ["mere utterance of an . . . epithet which engenders offensive feelings in an employee . . . does not sufficiently affect the conditions of employment" (citation and internal quotation marks omitted)]; *Brown v Coach Stores, Inc.*, 163 F3d 706, 713 [2d Cir 1998] [no hostile work environment where supervisor made, on occasion, racist remarks, including one directed at the plaintiff]). Nor has plaintiff shown, or even alleged, that the egregious remarks interfered in any way with her job performance.

Moreover, the use of racial slurs and insults by a supervisor without the knowledge or acquiescence of the employer does not constitute an unlawful discriminatory practice actionable under the State Human Rights Law (*see Matter of General Motors Corp., Fisher Body Div. v State Human Rights Appeal Bd.*, 54 NY2d 905 [1981], *affg* 78 AD2d 1006 [4th Dept 1980]; *see also Hart v Sullivan*, 55 NY2d 1011 [1982], *affg* 84 AD2d 865 [3d Dept 1981]). For an "employer cannot be held liable [under state law] for an employee's discriminatory act unless the employer became a party to it by encouraging, condoning, or approving it" (*Matter of State Div. of Human Rights v St. Elizabeth's Hosp.*, 66 NY2d 684, 687 [1985], quoting *Matter of Totem Taxi, Inc. v New York State Human Rights Appeal Bd.*, 65 NY2d 300, 305 [1985]). Plaintiff has failed to offer any evidence that the Guild knew of, let alone condoned or acquiesced in, the epithets. The record is devoid of proof that plaintiff ever

reported any of the alleged remarks or indeed any other allegations of *racial* harassment to anyone at the Guild, or brought a complaint utilizing the procedures established pursuant to the Guild's antidiscrimination policy, which is contained in the record.[10]

Plaintiff's arguments reflect a fundamental misapprehension of the law of summary judgment. To be sure, plaintiff has identified disputed issues of fact. But factual disputes are not enough; they must relate to *material* issues. Whether Dersh snatched a pad from plaintiff's hand out of sheer rudeness or because she was struck by the quality of plaintiff's notetaking is irrelevant when, as a matter of law, in neither event would a claim of racial discrimination be established. Nor do we find material whether defendants' contemporaneous assessment of plaintiff's recordkeeping skills was justified. "The mere fact that [plaintiff] may disagree with [her] employer's actions or think that [her] behavior was justified does not raise an inference of pretext" (*Estrada v Lehman Bros., Inc.*, 2001 WL 43605, \*5, 2001 US Dist LEXIS 288, \*15 [SD NY, Jan. 18, 2001] [citations omitted]; *see also Jimoh v Ernst & Young*, 908 F Supp 220, 226 [SD NY 1995] ["As a matter of law, an employee's disagreement with an employer's business decision is insufficient to prove discriminatory conduct"]).

Similarly, a resolution of whether or not plaintiff's supervisors used racial epithets—an allegation denied by defendants—could not alter the conclusion that, even were they uttered, on this record they are insufficient to make out a hostile work environment.

## III. Retaliation

Under both the State and City Human Rights Laws, it is unlawful to retaliate against an employee for opposing discriminatory practices (*see* Executive Law § 296 [7]; Administrative Code of City of NY § 8-107 [7]). In order to make out the claim,

---

**10.** Since plaintiff has failed to establish the elements of a hostile work environment claim with respect to either her state or city causes of action, we need not address the affirmative defense to such a claim against an employer—that the employer exercised reasonable care to prevent and correct promptly discriminatory conduct committed by its supervisory personnel, such as by promulgating an antidiscrimination policy with complaint procedure, and that the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to otherwise avoid harm (*see Burlington Indus., Inc. v Ellerth*, 524 US 742, 765 [1998]; *Faragher v City of Boca Raton*, 524 US 775, 805-808 [1998]).

plaintiff must show that (1) she has engaged in protected activity, (2) her employer was aware that she participated in such activity, (3) she suffered an adverse employment action based upon her activity, and (4) there is a causal connection between the protected activity and the adverse action.

■ Plaintiff's showing fails on every prong. No triable issue of fact exists that plaintiff engaged in a protected activity—that is, opposing or complaining about unlawful discrimination[11] —or, a fortiori, that the Guild was aware of any such complaint. Although plaintiff filed numerous grievances claiming generalized "harassment," she never alleged that she was discriminated against because of race, or invoked the article of the Collective Bargaining Agreement prohibiting such practices.[12] Moreover, plaintiff has "failed to submit sufficient evidence from which a jury could reasonably conclude a causal connection between any protected activity [s]he engaged in and any adverse employment action" (*Francis v Chemical Banking Corp.*, 213 F3d 626 [table; text at 2000 WL 687715, *1, 2000 US App LEXIS 11896, *3 (2d Cir 2000)], *cert denied* 532 US 949 [2001]), or, as with her discrimination claim, to rebut defendant's evidence that any adverse action taken against her was justified by the legitimate, nondiscriminatory reasons already described.

Nor can plaintiff avoid summary judgment "by merely pointing to the inference of causality resulting from the sequence in time of the events" (*Chojar v Levitt*, 773 F Supp 645, 655 [SD NY 1991]; *see also Feliciano v Alpha Sector, Inc.*, 2002 WL 1492139, *12, 2002 US Dist LEXIS 12631, *35 [SD NY, July 12, 2002] ["As a matter of law, (t)he mere fact that the incidents of which (a plaintiff) complains occurred after . . . grievances

11. The concurrence states that "[f]or a union member, filing grievances with the union is a protected activity" (concurring op at 327). Under the New York State and City Human Rights Laws—the only statutes under which plaintiff has brought causes of action—retaliation is actionable only when it is done because the employee has, for example, filed a complaint, testified, or assisted in any proceeding, or opposed any practices forbidden "under this article" (Executive Law § 296 [7]) or "under this chapter" (Administrative Code of City of NY § 8-107 [7]). Filing a grievance complaining of conduct other than unlawful discrimination—as plaintiff did—is simply not a protected activity subject to a retaliation claim under the statutes at issue here.

12. Plaintiff's discrimination complaint with the New York City Commission on Human Rights was filed in September 1994, after plaintiff had begun her final leave of absence from the Guild. Plaintiff has offered no evidence that the Guild was made aware of this complaint before her alleged termination.

were filed does not create an issue of fact as to causality" (citations and internal quotation marks omitted)]).[13]

■ Further, because plaintiff has failed to raise a triable issue of material fact that she was either retaliated against or discriminated against because of her race, her claims that defendants aided and abetted each other in any discrimination or retaliation cannot survive (see Executive Law § 296 [6]; Administrative Code of City of NY § 8-107 [6]).

In short, we agree with the Appellate Division that, on this record, it does no favor to the litigants, or to the law, or to the rigorous enforcement of genuine discrimination claims, to deny summary judgment and allow this case to proceed to trial.

Accordingly, the order of the Appellate Division should be affirmed, with costs.

G.B. SMITH, J. (concurring). The question on this appeal is whether appellant has raised a factual issue that precludes summary judgment. While appellant has sufficiently raised triable issues of fact on her claims of disparate treatment, hostile work environment and retaliation in the first instance, respondents have met their burden of giving nonracial reasons for her treatment and appellant has not demonstrated that those reasons are pretextual. I, therefore, concur in affirming the order of the Appellate Division.

Appellant began working for defendant as a music therapist in September 1985. From 1990 to 1991, she took a leave of absence to study for a Master's degree in urban education.

I

Two separate but related analyses are relevant on this appeal, the standard governing summary judgment and the standard governing the allegations of racial discrimination alleged by plaintiff.

"To grant summary judgment, it must clearly appear that no material and triable issue of fact is presented" (Glick & Dolleck v Tri-Pac Export Corp., 22 NY2d 439, 441 [1968]; see also Zuck-

---

13. Indeed, although plaintiff argues that the close proximity of the termination and complaints suggests that there may have been nonpermissible reasons for her firing, all of plaintiff's grievances were filed in 1992. Plaintiff's alleged termination, however, did not occur until early November 1994. And although plaintiff filed a complaint with the Commission on Human Rights in September 1994, there is no evidence that defendants had yet learned of the existence of this complaint prior to her termination.

*erman v City of New York*, 49 NY2d 557 [1980]). Summary judgment should not be granted where there is any doubt as to the existence of a factual issue or where the existence of a factual issue is arguable (*Glick & Dolleck v Tri-Pac*, 22 NY2d at 441). On a summary judgment motion, the moving party must set forth evidence that there is no factual issue and that it is entitled to summary judgment (*Zuckerman v City of New York*, 49 NY2d at 560-562). If the moving party establishes a basis for a grant of summary judgment, the opposing party must present evidence that there is a triable issue (*id.*).

"It is not the court's function on a motion for summary judgment to assess credibility" (*Ferrante v American Lung Assn.*, 90 NY2d 623, 631 [1997]). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he [or she] is ruling on a motion for summary judgment or for a directed verdict" (*see Anderson v Liberty Lobby, Inc.*, 477 US 242, 255 [1986]).

Moreover, the facts must be viewed in the light most favorable to the nonmoving party (*see Matsushita Elec. Indus. Co., Ltd. v Zenith Radio Corp.*, 475 US 574, 587 [1986]). For the purposes of appealing a summary judgment motion, appellant's allegations of fact must be taken as true (*see Rajcoomar v TJX Cos., Inc.*, 319 F Supp 2d 430, 433 n 4 [SD NY 2004] ["The Defendant concedes that for the purposes of this motion it takes Rajcoomar's allegation of termination as true because all evidence must be viewed in a light most favorable to a plaintiff on a motion for summary judgment"]; *Catanzaro v Weiden*, 140 F3d 91, 93-94 [2d Cir 1998] ["All evidence presented by the nonmoving party must be taken as true, and all inferences must be construed in a light most favorable to the nonmoving party"]). Of course, the standard for determining the outcome of the motion is whether or not there are any genuine issues of material fact in dispute (*see Glick & Dolleck v Tri-Pac Export Corp.*, at 441). Moreover, for the purposes of review, the facts as stated by the nonmovant must be taken as true.

The second analysis relates to the showing appellant must make to support her claim of racial discrimination and to defeat summary judgment.

Forrest sues under Executive Law § 296 (1) (a)[1] and Administrative Code of the City of New York § 8-107 (1) (a)[2] proscribing racial discrimination in employment in New York State and New York City. The first cause of action is for race and color discrimination in violation of Executive Law § 296. The second cause of action is for race and color discrimination in violation of Administrative Code § 8-107. The third cause of action is for retaliation in violation of Executive Law § 296 (1) (e) and (7). The fourth cause of action is for retaliation in violation of Administrative Code § 8-107 (7). The fifth cause of action is for aiding and abetting in violation of Executive Law § 296 (6). The sixth cause of action is for aiding and abetting in violation of Administrative Code § 8-107 (6). The seventh cause of action is for constructive discharge pursuant to Executive Law § 296. The eighth cause of action is for constructive discharge in violation of Administrative Code § 8-107.

These New York State and New York City laws are in accord with the federal standards under title VII of the Civil Rights Act of 1964 (42 USC § 2000e *et seq.*; *Matter of Aurecchione v New York State Div. of Human Rights*, 98 NY2d 21, 25-26 [2002]; *Ferrante v American Lung Assn.*, 90 NY2d 623, 629 [1997]; *Quinn v Green Tree Credit Corp.*, 159 F3d 759 [2d Cir 1998]).[3] The three-step framework established by the Supreme Court in *McDonnell Douglas Corp. v Green* (411 US 792 [1973]) for cases alleging violations of title VII of the Civil Rights Act of

---

**1.** Human Rights Law (Executive Law) § 296 (1) (a) states: "It shall be an unlawful discriminatory practice . . . [f]or an employer or licensing agency, because of the age, race, creed, color, national origin, sex, disability, genetic predisposition or carrier status, or marital status of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

**2.** Administrative Code § 8-107 states:
"Unlawful discriminatory practices.
"1. Employment. It shall be an unlawful discriminatory practice:
"(a) For an employer or an employee or agent thereof, because of the actual, or perceived age, race, creed, color, national origin, gender, disability, marital status, sexual orientation or alienage or citizenship status of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment."

**3.** Plaintiff in *Ferrante* raised a triable issue of fact that he had been fired because of age discrimination. Specifically, plaintiff demonstrated that defendant's reasons for terminating him could be pretextual for age discrimination.

1964 is relevant here. First, the appellant employee must make a prima facie showing of racial discrimination. Second, once the appellant has satisfied her burden, defendant must articulate a clear nondiscriminatory reason for the termination or other action. Third, appellant must show that the proffered reasons are pretextual.

## II

Appellant claims that she has met her burden of showing that there was racial discrimination and that there are factual issues concerning whether the proffered reason for her termination was pretextual.

Appellant, Forrest, worked as a music therapist and case manager for the Jewish Guild for the Blind. On November 2, 1994, appellant was terminated, allegedly due to failure to provide documentation of her father's medical condition. Forrest was on a three-month approved leave of absence, without pay, in order to take care of her ailing father in Florida. The Guild requested that she provide proof of her father's condition. Part of that proof was a form, provided by the Guild, to be completed by a physician indicating her father's diagnosis, prognosis and a doctor's recommendation that appellant's father required an in-home caregiver. Appellant argues that she sent the required information on a form different from the one required by respondent.

Appellant alleges that during her employment with the Guild, she was subjected to several racially motivated statements and conduct directed at her by her supervisors. Specifically, appellant alleges that on or about October 19, 1992, Eugenia Adlivankina, appellant's immediate supervisor, told her that Goldie Dersh, who was the program director in the Continuing Day Treatment Program, called appellant "an uppity nigger." The assertion that Dersh made this statement was allegedly repeated to her by another employee, Dr. Dov Rappaport. Appellant alleges further that on or about October 26, 1992, at a staff meeting, Dersh stated, "Why is it necessary to stroke Blacks to get them to work?" The third comment, reportedly made to White staff members by Adlivankina "on at least four occasions" on the same day was that staff members should refer to Forrest as "our Black American Princess." Appellant claims that she filed grievances on two of these incidents, although on the advice of her union representative, the grievances were filed in general terms.

Appellant further asserts that she was required to perform the duties of two separate titles and was not compensated for overtime while White staff did receive such compensation. She also claims that her salary was reduced, that for over a year, she was required to sign in and out to go to the bathroom and for coffee breaks while White employees did not have to do the same. Her name, along with that of another African-American, was circled and highlighted on a sign-in sheet. Appellant reports that Adlivankina later came and apologized to her for circling her name. She alleges that she requested a description of her job duties and title, things that she was entitled to under the union agreement, but was denied them by her immediate supervisor. She claims that she filed grievances with her employer, but that these grievances were met with retaliation by means of threats, disciplinary actions that were not justified and by the assignment of additional duties. She claims that the conduct of her supervisors led to psychological problems for which she underwent treatment and incurred expenses. Finally, she claims that she was forced to resign because of defendants' actions.

Appellant filed five grievances with her union, Local 1199. The first, dated July 9, 1992, was filed to grieve "harassment of Paula Forrest in violation of contract and article IV, Section 1 and [article] XVII" of the Collective Bargaining Agreement (CBA).[4] The complaint was denied. On July 22, 1992, appellant filed a second complaint for harassment in violation of article IV, section 1 and article XVII of the CBA. This complaint was never heard. On October 8, 1992, appellant filed a grievance for violations of the Collective Bargaining Agreement including article XXI, section 13 and article IV, section 1.[5] On November 11, 1992, Carol Handfus denied the grievance of October 8, 1992 with a lengthy explanation concerning job classifications and job duties.[6] This complaint was sent to arbitration on December 9, 1992.

---

**4.** Article IV, section 1 pertains to management rights and article XVII addresses vacation schedules.

**5.** Article XXI, section 13 pertains to job classification.

**6.** Letter to Thomas Winter from Carol Handfus in pertinent part—
"In light of the foregoing, I have concluded that the addition of case management functions to the Grievant's job content does not justify a new classification nor prompt the need to negotiate an upgrade in compensation. And, while your argument that in job evaluation the whole can be greater that [sic] the sum of its parts is an interesting one, I take the traditional position that

The fourth complaint was filed on November 19, 1992, grieving the "verbal warning of 11/3/92 and the written warning of 11/13/92 concerning job perform[ance]" and "in violation of the CBA including Article IV Section 2."[7] This grievance was sent to the personnel director. The final grievance was filed on December 4, 1992 for harassment and "abus[e of] power and authority in a capricious manner without just cause." The grievance alleges violations of article IV, section 1 and article VII, section 1.[8] The grievance was denied.

On November 4, 1992, appellant sent a letter to a supervisor, Handfus, concerning "Bias Treatment in CDTP/Soc[ial] Serv[ices]/Harassment." This letter dealt specifically with choice of lunch time, and whether or not appellant was being treated differently based upon job title. Appellant transferred from the Continuing Day Treatment Program to the Day Treatment Program on January 8, 1993. Effective January 18, 1993, appellant assumed the job title of teaching specialist.

A settlement agreement, dated February 22, 1994, purportedly resolved "all allegedly outstanding grievances and the pending arbitration case arising out of or in connection with the Employee's former employment in CDTP." The settlement agreement addressed an increase in job classification, increase in pay, disciplinary written warnings, appellant's new job title of teacher/human services professional in the Day Treatment Program, and withdrawal by the union of a pending arbitration case.

Respondents offer evidence rebutting appellant's claims, including that the racially offensive statements were never made. Further, respondents allege that Forrest was terminated as a result of her failure to provide the necessary documentation for her extended leave of absence. Respondents also assert

---

salary upgrades are usually not warranted where an employee is asked to perform additional job duties that are of the same type as those being performed by other staff members, in a job classification that is in the same labor grade as that of the employee. This argument is particularly relevant when, as in this case, the new duties in question do not represent those that require the highest skill and attainment levels required by the other classification.

"For all of the foregoing reasons, I am denying this grievance and the remedies proposed by the Union."

7. Article IV, section 2 addresses client care and the participation of employees in the process of client care.

8. Article VII, section 1 refers to discharge and penalties.

that appellant's work was inadequate and that she failed to comply with recordkeeping requirements. In addition, respondents argue that Forrest resigned before she was terminated. Respondents also state that appellant was not in Florida at the time she stated she was but she had traveled to Hawaii to visit her brother. Finally, respondents argue that the Guild has a nondiscrimination policy with respect to race and other matters.

## III

Appellant commenced an action against respondents in 1998 in Supreme Court, New York County. In August 2002, Supreme Court denied defendants' motion for summary judgment. After referring to the factual allegations made by appellant, that court stated:

> "Plaintiff has raised a prima facie case of discrimination. The allegations raised by plaintiff, when analyzed in a light most favorable to plaintiff, may permit a trier of fact to conclude that plaintiff was forced to work in a hostile work environment as a result of her race. In addition to claims of egregiously inappropriate statements made by the individual defendants and humiliation suffered during staff meetings, she alleges that she was transferred to other positions and given additional duties and responsibilities not assigned to other employees who are not African-American.

> "The court cannot conclude that, when all the circumstances and individual acts are considered, the allegations do not constitute racial discrimination as a matter of law. Whether or not the explanations offered by defendants for transferring plaintiff to different departments and changing her responsibilities are pretextual also cannot be determined as a matter of law, especially when considered in conjunction with plaintiff's claims of persistent humiliation and hostility toward her. Upon this record, a trier of fact may conclude that the defendants' explanations for some of their actions are unpersuasive and that discrimination has occurred."

In October 2003, the Appellate Division reversed and granted defendants' summary judgment motion, finding that appellant had not shown that defendants' conduct toward her was racially

biased, or that the nondiscriminatory reasons for terminating appellant were pretextual. The Appellate Division decision stated the following:

"Certainly, the allegations of the complaint describe egregious conduct. However, on such a summary judgment motion, once the defendants have made a showing establishing a right to dismissal, the plaintiff's burden in opposing the motion requires more than allegations that, if proven, establish conduct of which we disapprove. The plaintiff must offer evidentiary support not only to establish a prima facie case, but also evidence creating a material dispute of fact as to the showing made by the defendants. . . .

"Here, the submitted documentation satisfies defendants' burden on a summary judgment motion of establishing their entitlement to dismissal of the complaint. They have established a legitimate and nondiscriminatory basis for almost all of the conduct of which plaintiff complains, leaving a remainder of claims that cannot alone serve as the basis for a claim of employment discrimination.

"Specifically, when we cull through plaintiff's claims in light of the evidentiary submissions, it becomes apparent that, as defendants point out, many of plaintiff's allegations are unsupported by, or actually disproved by, evidentiary materials, and that the conduct alleged to constitute discriminatory disparate treatment of plaintiff was based upon legitimate and nondiscriminatory reasons, unrelated to any racial animus. In response, plaintiff offers nothing tending to show that the proffered nondiscriminatory explanations are pretextual. All that then remains of plaintiff's claims are the hotly disputed allegations of racial epithets, which are simply insufficient by themselves to support her claim of race discrimination. Ultimately, plaintiff has failed to provide sufficient support to create a question of fact as to whether her termination, or any adverse treatment of her during her employment, 'occurred under circumstances giving rise to an inference of . . . discrimination' " (309 AD2d 546, 553-554 [2002] [citations omitted]).

This Court granted appellant leave to appeal.

## IV

It is not often that an employer will use overt methods to discriminate (*see Matter of Holland v Edwards*, 307 NY 38, 45 [1954] ["Far more likely is it that he will pursue his discriminatory practices in ways that are devious, by methods subtle and elusive—for we deal with an area in which 'subtleties of conduct . . . play no small part' "], quoting *National Labor Relations Bd. v Express Pub. Co.*, 312 US 426, 437 [1941]; *National Org. for Women v State Div. of Human Rights*, 34 NY2d 416, 420 [1974] ["(I)llegal discrimination will not be announced in public but will usually be effected by 'subtle' and 'elusive' means"]). Further, employers who discriminate are not likely to do so in an "open, plainly-appearing fashion" (*see Matter of Pace Coll. v Commission on Human Rights of City of N.Y.*, 38 NY2d 28, 40 [1975])[9] "Instead, there is likely to be covert resort to subtle tactics and the pretext of intermingled motives and reasons to obscure the substantial cause" (*see id.*).

Appellant's allegations of discriminatory treatment fall into several categories. Each category will be discussed.

## DISPARATE TREATMENT

### Prima Facie Case of Racial Discrimination

Disparate treatment is the treatment of persons in a manner less favorable than others because of their race. (*International Bhd. of Teamsters v United States*, 431 US 324, 335 n 15 [1977]; *see also Raytheon Co. v Hernandez*, 540 US 44, 52-53 [2003].)[10] " 'Disparate treatment' . . . is the most easily understood type

---

**9.** Complainant filed a claim of gender discrimination and failure to promote against the former Pace College, now Pace University. The New York City Commission on Human Rights found that Pace discriminated against women faculty generally and complainant, Dr. Winsey, in particular. The Appellate Term set aside the decision, and Appellate Division affirmed for lack of sufficient evidence. The Court of Appeals determined that there was not enough evidence to determine that there was a pattern of discrimination but that there was enough to find that Pace had discriminated against Dr. Winsey.

**10.** After 25 years of employment as a product test specialist with Hughes Missile Systems, later Raytheon Company, complainant in *Raytheon* was forced to resign because of workplace misconduct. He tested positive for cocaine while at work. Two years later, he reapplied for his job but his application was denied. He later filed a complaint with the Equal Employment Opportunity Commission (EEOC) for discrimination based on the Americans with Disabilities Act (ADA). Complainant argued that he was denied his position because of his past drug and alcohol abuse but that he was now rehabilitated.

of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin. Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment" (*International Bhd. of Teamsters v United States*, 431 US at 335 n 15).

Disparate treatment applies to complaints about acts of discrimination against an individual brought under title VII of the Civil Rights Act of 1964 (78 US Stat 253 as amended, codified at 42 USC § 2000e *et seq.*).

In order to establish at trial a claim of disparate treatment in employment based upon race, a prima facie showing of racial discrimination must be made (*see McDonnell Douglas Corp. v Green*, 411 US 792, 802-804 [1973]).[11] According to *Ferrante*, in order to establish a prima facie case of racial discrimination, ap-

Complainant put forth claims of both disparate impact and disparate treatment. The District Court rejected the disparate treatment claim and denied review of the disparate impact claim as untimely. Petitioner's summary judgment motion was granted.

The Court of Appeals, Ninth Circuit, determined that there were triable issues of fact regarding whether complainant was denied his position because of his past record of drug addiction. The Court of Appeals then applied a disparate impact analysis to a disparate treatment claim by determining that Raytheon's legitimate reason for firing was illegitimate as applied to recovering drug addicts. Summary judgment was vacated.

The Supreme Court determined that the Ninth Circuit erred in its analysis, and thus, set out the proper analysis for both disparate treatment and disparate impact claims. Further, after applying the proper analysis to the disparate treatment claim, the Supreme Court held that the employer had met its burden in showing a legitimate reason for failing to rehire.

**11.** *McDonnell* is a seminal case in the area of disparate treatment. In this case, complainant worked for McDonnell for eight years as a mechanic and laboratory technician when he was laid off as a result of work force reduction. (*See* 411 US at 794.) Complainant as part of a civil rights protest of the racially discriminatory policies of the employer, engaged in civil disobedience by blocking the main roads to petitioner's plant preventing workers from participating in the morning shift change. (*See id.*) Complainant was arrested for his participation in what was referred to as the "stall-in." (*Id.*) Another civil rights action took place some weeks later but it was unclear to what extent complainant participated in the second action. Subsequently, petitioner advertised for mechanics and complainant applied for re-employment but was rejected.

Upon rejection, complainant filed a complaint with the EEOC. The Commission found discrimination based upon civil rights violations but not racial discrimination. The District Court found no discrimination in hiring and no discrimination based on civil rights activities. The Court of Appeals, Eighth Circuit, reversed and determined that an EEOC claim was not a judicial determination and that the trial court could make a finding based upon racial

pellant has "the initial burden [of] prov[ing] by a preponderance of the evidence a prima facie case of discrimination" (90 NY2d at 629; *see also St. Mary's Honor Ctr. v Hicks*, 509 US 502, 506 [1993]; *Texas Dept. of Community Affairs v Burdine*, 450 US 248, 252-254 [1981]; *McDonnell Douglas*, 411 US at 802). The following elements must be proven: (1) the complainant is a member of a class protected by the statute; (2) the complainant was actively or constructively discharged; (3) the complainant was qualified to hold the position from which she was terminated; (4) and the discharge occurred under circumstances giving rise to an inference of race discrimination.

Because Forrest is an African-American female, she is a member of a protected class. She resigned from her position, by letter effective October 22, 1994, but before the Guild received her letter, the Guild fired her, effective August 5, 1994, in a letter dated November 2, 1994. The resignation letter was marked by the Guild and received on November 4, 1994. In any event, the Guild states that it was not aware of the letter of resignation when the letter of termination was drafted and mailed. For the purposes of this motion for summary judgment, it must be assumed that Forrest was terminated. Accordingly, appellant meets criteria one and two of *Ferrante*.

There is no dispute that Forrest was qualified for the position as evidenced by her credentials and tenure on the job. She was a professional music therapist with graduate degrees in music therapy and urban education. Appellant argues that she was discharged after filing several grievances and a little more than two months after filing a complaint with the New York City Commission on Human Rights for race and color discrimination in September 1994.[12] Thus, taken together, the racial epithets and assertions of disparate treatment are sufficient to establish a prima facie case of racial discrimination.

---

discrimination. The United States Supreme Court granted certiorari to clarify standards for a claim of racial discrimination. The Court set out the standards for proving a title VII claim for disparate treatment based upon a prima facie showing of racial discrimination. The Court was especially concerned about complainant's opportunity to rebut petitioner's legitimate reason for its employment determination as pretext (*see id.* at 806).

12. A complaint was filed with the Commission on Human Rights in September 1994. The complaint was closed on June 30, 1997. Appellant filed an action in the Federal District Court for the Southern District of New York in July 1997 alleging discrimination raising federal, state, and New York City antidiscrimination claims. The complaint was withdrawn in October 1997.

## Burden Shifts to Employer

Once appellant has established a prima facie case of racial discrimination, the burden shifts to the employer "to rebut the presumption of discrimination by clearly setting forth, through the introduction of admissible evidence, legitimate, independent, and nondiscriminatory reasons to support its employment decision" (*see Ferrante*, 90 NY2d at 629; *Burdine*, 450 US at 257-258; *Hicks*, 509 US at 507). The employer in this instance states that the reason for the termination was Forrest's failure to complete the "Certification of Physician or Practitioner" form. Defendants assert that several requests were made to secure the documentation but appellant was unresponsive. Thus, defendants have put forward a nonracial reason for appellant's termination.

## Evidence That Respondents' Claims Are Pretextual

On February 1, 1994, appellant filed a complaint with the New York State Division of Human Rights complaining that her grievances were not being taken seriously by the union. Forrest filed a complaint with the EEOC for racial discrimination just three months before the Guild fired her. The close proximity of the termination and complaints arguably suggests that there may have been nonpermissible reasons for her firing (*see Reeves v Sanderson Plumbing Prods., Inc.*, 530 US 133, 148 [2000] ["a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated"]). However, in contending that the defendants' reasons are pretextual, appellant must lay bare her proof on this motion for summary judgment.

Appellant must have a "full and fair opportunity" to demonstrate that the employer's reason for termination is pretextual and that the real reason for termination was racially based (*see Burdine*, 450 US at 256; *Ferrante*, 90 NY2d at 629-630; *McDonnell Douglas*, 411 US at 805 [complainant may show that employer's presumptively valid reasons for termination were a cover-up for racial discrimination]). Appellant contends that the employer used the failure to file the certification form as a pretext for racial discrimination (*see Matter of State Div. of Human Rights v County of Onondaga Sheriff's Dept.*, 71 NY2d 623, 632 [1988] [employer's reasons for termination gave rise to an inference of discrimination]; *Matter of Imperial Diner v State*

*Human Rights Appeal Bd.*, 52 NY2d 72, 78 [1980][13] [anti-semitic statements made by employer to employee could give rise to constructive discriminatory discharge]).

## Direct and Circumstantial Evidence in a Mixed Motive Case

A person alleging racial or other discrimination does not have to prove discrimination by direct evidence. It is sufficient if he or she proves the case by circumstantial evidence (*Desert Palace, Inc. v Costa*, 539 US 90 [2003]). Here, appellant could prove her case even if there were mixed motives for her firing, that is a legitimate and an illegitimate reason (*id.* at 99-102).

## RACIALLY HOSTILE WORK ENVIRONMENT

An employee has a right under title VII of the Civil Rights Act of 1964 "to work in an environment free from discriminatory intimidation, ridicule, and insult" (*Meritor Sav. Bank, FSB v Vinson*, 477 US 57, 65 [1986]). "[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance" (*Harris v Forklift Sys., Inc.*, 510 US 17, 23 [1993]). The evidence is judged by the totality of the circumstances test (*see id.*; *Williams v County of Westchester*, 171 F3d 98, 100 [2d Cir 1999]; *Dooner v Keefe, Bruyette & Woods, Inc.*, 157 F Supp 2d 265, 281 [SD NY 2001] ["(T)he Plaintiff must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment"], quoting *Cruz v Coach Stores, Inc.*, 202 F3d 560,

---

13. "As in other areas of discrimination it is unrealistic to hold that an employee can only be said to have been the victim of a discriminatory discharge when the employer has expressly fired him on the basis of race or creed or some other discriminatory ground. It is also possible, and perhaps more likely, that an employer who believes certain individuals are undesirable employees because of some discriminatory factor, will engage in conduct which encourages the employee to quit, in which case it may be said that there has been a constructive discriminatory discharge" (52 NY2d at 78).

Complainant was told by her company president that she was "Just like all the other f---ing Jewish broads around here" (52 NY2d at 76). The president then went on to say that in this diner the "f---ing Jewish women . . . think they are something special and deserve more than the others" (52 NY2d at 76). The president then refused to apologize for his comments. Complainant resigned. The Court of Appeals found that there was enough evidence to support a claim of constructive discharge.

570 [2d Cir 2000]; *accord Whidbee v Garzarelli Food Specialties, Inc.*, 223 F3d 62, 69 [2d Cir 2000]). "[T]he objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position considering 'all the circumstances' " (*Oncale v Sundowner Offshore Servs., Inc.*, 523 US 75, 81 [1998]; *Harris v Forklift,* 510 US at 23). Thus, plaintiff does not have to prove an intent to discriminate.

Addressing only the racial epithets, appellant should be entitled to show that such statements interfered with Forrest's work environment (*see Schwapp v Town of Avon,* 118 F3d 106, 110 [2d Cir 1997] [opprobrious racial comments were evidence enough to deny summary judgment motion]). If White staff were encouraged to call appellant "our Black American Princess," on several occasions, and/or she was perceived to be or stated to be "an uppity nigger," and/or appellant and other African-Americans were perceived as lazy people requiring stroking in order to work, appellant has alleged enough to withstand summary judgment.

## RETALIATION

In order to make a prima facie showing of retaliation, Forrest must show: (1) participation in a protected activity known to defendant; (2) an adverse employment action; and (3) a causal connection between the protected activity and the adverse employment action (*see Francis v Chemical Banking Corp.*, 62 F Supp 2d 948, 961 [ED NY 1999]). Forrest filed several grievances with the union and with personnel director, Carol Handfus. For a union member, filing grievances with the union is a protected activity (*see Vara v Mineta,* 2004 WL 2002932, *13-14, 2004 US Dist LEXIS 17961, *41-46 [SD NY, Sept. 7, 2004]; *Feingold v New York,* 366 F3d 138, 156 [2d Cir 2004]). Filing complaints with the EEOC and Human Rights Commission are also protected activities (*id.*). Defendants' knowledge of appellant's assertions is evidenced by the signatures of Carol Handfus and Dersh on the grievance letters and the meetings on the grievances.

Adverse actions are those which affect the "terms, privileges, duration, or conditions of the plaintiff's employment" (*see Dortz v City of New York,* 904 F Supp 127, 156 [SD NY 1995] [citation omitted]). Forrest claims that after filing grievances, her job title, office space, vacation requests, and job duties were adversely affected. Appellant alleges that she was demoted from music therapist to creative arts therapist, case manager and/or

that she was required to perform the duties of both the creative arts therapist and case manager. Appellant filed a grievance concerning the increase in job duties without any commensurate increase in pay. Further, appellant claims that she suffered a reduction in pay of approximately $2,500 as a result of her grievances.

Appellant claims retaliation by changing the conditions of her employment (e.g., change of her lunch hour, and constant complaints about her written work product). Appellant in a letter to Handfus complained about the denial of her previous lunch hour, and made a request for clarification concerning what if any changes had been made which would cause her to have a different lunch hour than prior to November 1992.

Respondent claims that any changes in job title and duties were the result of a state-mandated restructuring which occurred in 1991. Because of the restructuring, the employees with titles of music therapist were allegedly changed to creative arts therapist and later case manager. What restructuring was required is not shown in this record. However, even with the restructuring, many of the complaints of appellant to her supervisor came much later in 1992 and concerned the change in matters of benefits, not just job title. Further, appellant consistently stated that her credentials were superior to the new job duties, and that the new job was not the job she accepted with the Guild.

Whether or not these changes occurred as a result of the grievances filed by appellant would arguably be a question of fact for the jury. Further, whether or not appellant was terminated as a result of her grievances and for filing a complaint in September 1994 with the EEOC and New York City Human Rights Commission would also arguably be questions for the jury.

## CLAIMS OF AIDING AND ABETTING RACIAL DISCRIMINATION

Appellant asserts that Handfus, Dersh, Adlivankina, and Finocchiaro aided and abetted the racial discrimination in employment against her. Appellant points to Executive Law § 296 (6) and Administrative Code § 8-107 (6) which both proscribe aiding and abetting in unlawful discrimination. The standard for proving aiding and abetting is that the defendants "actually participate[d]" in the alleged discriminatory acts (*see Dunson v Tri-Maintenance & Contrs., Inc.*, 171 F Supp 2d 103, 114 [ED

NY 2001] [finding of actual participation in firing]). The person alleged to have engaged in the discrimination does not have to have power to hire and fire, just "direct participation" in the discrimination (see id.).

Appellant claims that the Guild failed to act on her numerous grievances, and failed to remedy the problems of harassment. While there are no grievances explicitly stating racial harassment, appellant alleges that this was due to the advice and guidance of her union representative and there is a grievance for "harassment" and "special treatment" and for "a standard only being applied to me."

Appellant has made out a prima facie case of racial discrimination. What is lacking in the record and in appellant's presentation is an adequate showing that respondents' claims are pretextual. The Appellate Division considered each of appellant's claims and concluded that the respondents had met their burden of showing legitimate reasons for their actions. In response to respondents' assertions, plaintiff had to lay bare her proof that these claims were pretextual.

There are several reasons why appellant's responses on pretext are inadequate. First, appellant does not rebut respondents' claims that some of their administrative moves were mandated by the State. A proper response would have been to show that there was no mandated state policy or that respondents did not address that policy in their actions involving appellant. Second, appellant does not adequately address the allegedly comprehensive settlement agreement of February 1994 and show that the settlement included racial matters or, if it did not, why not. Third, appellant does not address why she did not respond to the communications sent to her in Florida in the manner requested, specifically why she did not obtain from her father's doctor the specific information sought. Finally, appellant does not present adequate medical evidence that her psychological treatment was related to the racial hostility of the defendants. In sum, appellant has not demonstrated that the respondents' reasons for their various actions toward her were pretextual and that the real motivating factor was racial.

If appellant had met her burden of demonstrating that the respondents' claims were pretextual, a jury should determine whether appellant's evidence supported her claims of discrimination based on race. Thus, she would be entitled to present evidence of whether the racial epithets, combined with the alleged

actions toward her, were enough to alter her job conditions and work and even resulted in a constructive discharge (*see Matter of Imperial Diner v State Human Rights Appeal Bd.*, 52 NY2d 72 [1980], *supra*; *Matter of Pace Coll. v Commission on Human Rights of City of N.Y.*, 38 NY2d 28 [1975], *supra*). Similarly, whether or not the conduct towards her was the result of grievances filed and whether her termination resulted from her grievances and her filing a complaint in September 1994 with the EEOC and the New York City Human Rights Commission would be questions for a jury.

Because respondents have offered nonracial reasons for their actions and because appellant did not lay bare her proof and show that the respondents' claims were pretextual, I concur in the affirmance of the order of the Appellate Division.

Judges CIPARICK, ROSENBLATT, GRAFFEO, READ and R.S. SMITH concur with Chief Judge KAYE; Judge G.B. SMITH concurs in result in a separate opinion.

Order affirmed, with costs.